**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 3, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JIMMY DALE BLAND,

      Petitioner-Appellant,

v.

MARTY SIRMONS, Warden,
Oklahoma State Penitentiary,[*]

      Respondent-Appellee.

No. 05-6013

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. CIV-01-718-L)**

---

David Autry, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Seth S. Branham, Assistant Attorney General of Oklahoma (W.A. Drew
Edmondson, Attorney General of Oklahoma, with him on the briefs), Oklahoma
City, Oklahoma, for Respondent-Appellee.

---

Before **KELLY**, **BRISCOE**, and **McCONNELL**, Circuit Judges.

---

**McCONNELL,** Circuit Judge.

---

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Marty Sirmons
is substituted for Mike Mullin as Warden of the Oklahoma State Penitentiary.

Jimmy Dale Bland, an inmate on death row in the Oklahoma State Penitentiary, appeals the district court's denial of his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Mr. Bland was convicted of one count of first-degree malice-aforethought murder. The jury found the existence of two aggravating factors and recommended that he be sentenced to death. The trial court adopted the jury's recommendation, and the Oklahoma Court of Criminal Appeals affirmed. *Bland v. State*, 4 P.3d 702, 709 (Okla. Crim. App. 2000). The state courts denied his requests for post-conviction relief. Mr. Bland now appeals the district court's denial of his habeas petition, challenging aspects of both the guilt and sentencing phases of his trial. For the reasons set forth below, we affirm the decision of the district court.

## I. Background

### A. The Crime

On November 14, 1996, Jimmy Dale Bland shot and killed Doyle Windle Rains in Mr. Rains's garage in Manitou, Tillman County, Oklahoma. *Bland*, 4 P.3d at 709. He had been out of prison less than a year. He had served almost twenty years of a 60-year sentence for killing a man and kidnapping the victim's wife and son. Tr. Jury Trial, Day Seven, at 39-45, 55, 62-64, 107. At trial, Mr. Bland admitted killing Mr. Rains, but defended on the ground that the killing was neither malice-aforethought murder nor felony murder. *Bland*, 4 P.3d at 710.

According to the government's evidence, Mr. Bland worked for Mr. Rains doing miscellaneous construction and handyman jobs. *Id.* at 709; Tr. Jury Trial, Day Five, at 33. Mr. Rains was romantically involved with Mr. Bland's mother. Tr. Jury Trial, Day Five, at 26. Although Mr. Bland testified that the two men were "pretty good friends," *id.* at 27, their financial relations, as well as Mr. Rains's relationship with Mr. Bland's mother, were sources of friction. Mr. Bland was chronically short of money, which he used to feed his drug habit. *See id.* at 79. Mr. Rains would allocate their earnings between the two of them, usually keeping well more than half for himself. *See id.* at 35-36. On at least one occasion, Mr. Bland told his girlfriend, Connie Lord, that he planned to kill Mr. Rains, and said that he would dispose of the body by placing it in a well and putting cement on it. Tr. Jury Trial, Day Four, at 68, 73-74.

On November 14, 1996, Mr. Rains lent Mr. Bland his Cadillac so that Mr. Bland could drive to Oklahoma City and visit Ms. Lord. *Bland*, 4 P.3d at 709. During the visit, Mr. Bland spent nearly all of the cash he brought with him, most of it on drugs, which he and Ms. Lord immediately ingested. *Id.* Ms. Lord gave Mr. Bland $10.00 so that he could return home. *Id.* On the way home, Mr. Bland stopped and consumed the remaining drugs he had purchased in Oklahoma City. Tr. Jury Trial, Day Five, at 41. On his return to Manitou, before going home, Mr. Bland drove to Mr. Rains's home to return the Cadillac. *Bland*, 4 P.3d at 709. He brought a .22-caliber bolt-action rifle, concealed in a roll of coveralls. *Id.*

Angry with Mr. Rains and desperate for cash, Mr. Bland shot Mr. Rains in the back of the head. *Id.* Mr. Bland then loaded Mr. Rains's body into a pickup truck, washed out the garage area where the killing had occurred, drove to a rural area, and "[d]umped [the] body in a creek and covered it up," hoping that no one would find it. Tr. Jury Trial, Day Five, at 67-68; *Bland*, 4 P.3d at 709.

Mr. Bland offers a slightly different story. According to his testimony at trial, he had taken the rifle with him on his trip to Oklahoma City, in accordance with his usual practice. Tr. Jury Trial, Day Five, at 53. It was still with him in the Cadillac when he arrived at Mr. Rains's home. *Id.* Although Mr. Rains had given Mr. Bland the gun to "[s]hoot frogs or snakes or whatever," Mr. Bland did not want Mr. Rains to know that he "was carrying it around driving [Mr. Rains's] car." *Id.* at 54. To ensure that Mr. Rains did not see the weapon, Mr. Bland removed it from the vehicle, rolled it into a pair of coveralls, and carried it under his arm. *Id.* at 53-54. The two men got into a fight over a damaged hubcap on the Cadillac. *Id.* at 60. While in Mr. Rains's garage, Mr. Rains took a swing at Mr. Bland, and Mr. Bland then "leaned back and kicked [Mr. Rains's] leg out from under him," at which point both men fell down. *Id.* at 62-63; *Bland*, 4 P.3d at 710. When Mr. Bland fell, "the coveralls fell out from under [his] arm," then "[t]he gun fell out and [he] just picked it up and fired." Tr. Jury Trial, Day Five, at 63; *Bland*, 4 P.3d at 710.

Whatever the precise sequence of events at Mr. Rains's home, Mr. Bland admits that he loaded the body into a pickup truck, drove to a remote area, dumped the body into a creek, and covered it with logs. *Bland*, 4 P.3d at 710. When he was apprehended by law enforcement several days later, he had over $300 in cash on his person, presumably taken from Mr. Rains. *Id.* He then returned to Mr. Rains's home and spent the night there. *Bland*, 4 P.3d at 709. He told his mother the next day that he had gone to work with Mr. Rains. *Id.*

It was several days before Mr. Bland was apprehended. On a tip from Ms. Lord, conveyed through her sister, Tillman County law enforcement officials visited and searched Mr. Rains's home, discovered that Mr. Rains and his pickup were missing, and observed blood on the garage floor and on a spray washer they found in the garage. *Id.*; Tr. Jury Trial, Day Three, at 75. They listed Mr. Rains and his pickup on the NCIC register of missing persons. *Bland*, 4 P.3d at 709-10. On November 16, Mr. Bland drove Mr. Rains's truck off the side of the road between Stroud and Chandler, Oklahoma. Tr. Jury Trial, Day Four, at 29-30. He was arrested for driving under the influence, and released on bond. *Bland*, 4 P.3d at 710.

At this point, law-enforcement officials had drawn no connection between Mr. Bland and the disappearance of Mr. Rains. Shortly thereafter, however, the sheriff in Chandler contacted the sheriff's office in Tillman County regarding the NCIC listing for the missing truck. Tr. Jury Trial, Day Three, at 81-82. A

warrant was issued for the arrest of Mr. Bland for the unauthorized use of a motor vehicle. *Id.* at 83. On November 20, law enforcement officials located and arrested Mr. Bland at a friend's home, where he was hiding in a closet. *Id.* at 116-20. Neither then, nor during his previous encounter with law enforcement in connection with the drunk-driving accident, nor in an earlier conversation with his mother, did Mr. Bland explain the circumstances of Mr. Rains's death.

Mr. Bland was taken to the Tillman County sheriff's office, where he confessed to killing Mr. Rains. *Bland*, 4 P.3d at 710. Mr. Bland took officers to the creek where he had dumped Mr. Rains's body. *Id.* Although the body was badly decomposed, an autopsy established that the cause of death was a bullet wound to the back of the head. *Id.*

## B. Judicial Proceedings

At trial, Mr. Bland admitted that he shot Mr. Rains, but claimed that he never intended to kill him. *Id.* The State argued that Mr. Bland committed the murder with malice aforethought and as part of the commission of a felony, namely robbery. The State's theory was that Mr. Bland killed Mr. Rains to obtain money to purchase drugs, or alternatively that Mr. Bland intended to kill Mr. Rains for several months prior to the actual murder because Mr. Bland was displeased with his employment arrangement and troubled by Mr. Rains's romantic relationship with his mother. Defense counsel stipulated that Mr. Bland was guilty of first-degree heat-of-passion manslaughter. Defense counsel also

contended that Mr. Bland was under the influence of drugs when he killed Mr. Rains.

The jury convicted Mr. Bland only of first-degree malice-aforethought murder. *Id.* at 709; O.R. Vol. II, Doc. 383-84. At the sentencing phase, the Bill of Particulars charged that the crime committed by Mr. Bland should be punished by death due to the existence of three aggravating circumstances: (1) Mr. Bland "was previously convicted of a felony involving the use or threat of violence to the person"; (2) the "murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution"; and (3) the "existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." O.R. Vol. I, Doc. 7.

To establish these aggravating factors, the prosecution presented evidence about the circumstances of Mr. Bland's prior kidnapping and manslaughter convictions. The prosecution showed that Mr. Bland, while intoxicated, arrived at Raymond Prentice's home, waited for Mr. Prentice to appear on the front porch, and shot Mr. Prentice three times. Tr. Jury Trial, Day Seven, at 63-64. Mr. Bland then went inside, found Mrs. Prentice and her three-year old son, and ordered them into a car. *Id.* at 38, 45, 64. Before they could leave the Prentice home, however, Mrs. Prentice's brother came to the door. *Id.* at 44. Mr. Bland fired numerous shots at her brother, but did not kill him. *Id.* Mr. Bland then kidnapped Mrs. Prentice and her son. *Id.* at 45. The ordeal ended in a shootout

between Mr. Bland and the police. *Id.* at 48. The prosecution also focused on the heinous nature of both crimes and the short period of time between Mr. Bland's release and his second killing. *See id.* at 158, 191.

After evidence was presented at the sentencing phase, the court struck the "committed for the purpose of avoiding or preventing a lawful arrest" aggravating circumstance. *Id.* at 145. The jury found the existence of the remaining two aggravating circumstances and sentenced him to death. *Id.* at 206; O.R. Vol. III, at 411-12.

The OCCA affirmed Mr. Bland's conviction and sentence. *Bland*, 4 P.3d at 735. The United States Supreme Court denied Mr. Bland's petition for writ of certiorari on January 8, 2001, *Bland v. Oklahoma*, 531 U.S. 1099 (2001) (mem.), and the OCCA denied post-conviction relief in an unpublished opinion on June 26, 2000, *Bland v. State*, No. PCD-99-1200 (June 26, 2000). On November 26, 2001, Mr. Bland filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma.

The district court denied the petition on December 14, 2004, but granted a certificate of appealability on six grounds: (1) jury instructions and prosecutorial argument regarding the lesser included offense of first-degree manslaughter; (2) prosecutorial argument diminishing the jury's sense of responsibility for a death verdict; (3) Mr. Bland's absence from a portion of *voir dire*; (4) prosecutorial comments on Mr. Bland's post-arrest silence; (5) prosecutorial misconduct; and

(6) ineffective assistance of counsel.  R. Docs. 61, 71; Br. of Pet./Aplt. Attach. 5. On March 17, 2005, in a case management order, this Court granted a certificate of appealability as to two additional issues: (1) whether the state court deprived Mr. Bland of "a fair trial by refusing to submit an instruction on the offense of 'manslaughter by resisting criminal [attempt]'"; and (2) whether the district court should have granted an evidentiary hearing on whether Mr. Bland was denied the effective assistance of counsel.  Case Mgmt. Order, Mar. 17, 2005, at 1-2; Br. of Pet./Aplt. Attach. 6.

## II.  Standard of Review

Because Mr. Bland filed his habeas corpus petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), its standards apply to claims in this appeal adjudicated on the merits by the state courts.  *See Turrentine v. Mullin*, 390 F.3d 1181, 1188 (10th Cir. 2004); *Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir. 1999).  Under AEDPA, a petitioner is entitled to federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  In evaluating a state prisoner's habeas petition, we presume that the factual findings of the state court are correct and place the burden on the petitioner to rebut that

-9-

presumption by clear and convincing evidence. *Id.* § 2254(e)(1); *Smith v. Mullin*, 379 F.3d 919, 924-25 (10th Cir. 2004). We review the district court's legal analysis of the state court decision *de novo*. *Turrentine*, 390 F.3d at 1189.

In applying § 2254(d), we first determine whether the principle of federal law on which the petitioner's claim is based was clearly established by the Supreme Court at the time of the state court judgment. *Id.* If so, we then consider whether the state court decision was "contrary to" or an "unreasonable application of" that clearly established federal law. A decision is "contrary to" clearly established federal law for purposes of § 2254 if "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from" the result reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). It is not enough that the state court decided an issue contrary to a lower federal court's conception of how the rule should be applied; the state court decision must be "diametrically different" and "mutually opposed" to the Supreme Court decision itself. *Id.* at 406. A state court decision involves an "unreasonable application" of federal law if "the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

Even if the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, our analysis is not complete. Unless the error is a structural defect in the trial that defies harmless-error analysis, we must apply the harmless-error standard of *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and *O'Neal v. McAninch*, 513 U.S. 432 (1995). *Turrentine*, 390 F.3d at 1189. Under *Brecht*, habeas relief is proper only if the error had a "'substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 623 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). Under *O'Neal*, a "substantial and injurious effect" exists when the court finds itself in "grave doubt" about the effect of the error on the jury's verdict. *O'Neal*, 513 U.S. at 435. "Grave doubt" exists where the issue of harmlessness is "so evenly balanced that [the court] feels [itself] in virtual equipoise as to the harmlessness of the error." *Id.*

The § 2254(d) standard does not apply to issues not decided on the merits by the state court. *Turrentine*, 390 F.3d at 1189; *see Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999) (noting that the § 2254 standard does not apply to a decision disposing of a claim on procedural grounds). For those claims, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *Mitchell v. Gibson*, 262 F.3d 1036, 1045 (10th Cir. 2001). However, if the district court based its factual findings entirely on the state court record, we review that record independently. *Turrentine*, 390 F.3d at 1189.

-11-

### III. Issues for Review

#### A. *Heat of Passion Manslaughter Instruction*

Mr. Bland first argues that his right to due process of law under the Fourteenth Amendment was violated through jury instructions and prosecutorial argument that prevented the jury from considering his affirmative defense of heat of passion manslaughter. Specifically, he argues that the jury instructions failed to require the State to disprove heat of passion beyond a reasonable doubt, in violation of the Supreme Court's decision in *Mullaney v. Wilbur*, 421 U.S. 684, 704 (1975). He also contends that the prosecution improperly argued to the jury that manslaughter could not be considered unless a reasonable doubt existed as to the murder charge. The State argues that he failed to exhaust his *Mullaney* claim, and also defends the decision on the merits.

In his brief on direct appeal to the OCCA, Mr. Bland conceded that the jury was instructed in accordance with *McCormick v. State*, 845 P.2d 896, 900-01 (Okla. Crim. App. 1993), which upheld Oklahoma's instructions on heat-of-passion manslaughter against a *Mullaney* challenge. Instead, he focused his argument on the prosecution's closing arguments. Br. of Appellant, OCCA Case No. F-98-152, at 34. He argued that "[t]he trial court erred in allowing the prosecution to instruct the jury to not consider Mr. Bland's affirmative defense of first degree manslaughter unless the jury had first found reasonable doubt for first degree murder." *Id.* at 33 (emphasis omitted). In making this argument, Mr.

-12-

Bland cited both *Mullaney* and *United States v. Lofton*, 776 F.2d 918, 921 (10th Cir. 1985), a decision from this Court interpreting *Mullaney* to require the government to prove, beyond a reasonable doubt, the absence of heat of passion to obtain a murder conviction. Br. of Appellant, OCCA Case No. F-98-152, at 33-34. Essentially, he argued that the prosecution's decision to "specifically t[ell] the jury that it could not consider defendant's affirmative defense of first degree manslaughter unless the jury first found reasonable doubt for the offense of first degree murder" effectively modified the instructions such that they violated *McCormick*, *Lofton*, and *Mullaney*. Br. of Appellant, OCCA Case No. F-98-152, at 34. Mr. Bland concluded this argument with a one-sentence citation to *Mullaney*, stating that his "right to due process was violated because the State was exempted from its duty to prove first degree murder beyond a reasonable doubt." *Id.* at 35.

Noting Mr. Bland's concession that the jury instructions were proper under Oklahoma law, the OCCA construed Mr. Bland's argument solely as one of prosecutorial misconduct. *Bland*, 4 P.3d at 726. Because defense counsel did not object to the prosecution's argument at trial, the OCCA reviewed Mr. Bland's claim for plain error. *Id.* The OCCA concluded that because the jury was properly instructed as to the manner in which the murder and manslaughter charges should be considered, and there was no evidence that the jury failed to

follow their written instructions, any misstatements by the prosecutor "could not have affected the outcome of the trial." *Id.*

In his habeas petition in the district court, Mr. Bland argued both that the trial court "should have given an instruction that unless the State disproved the affirmative defense of 'heat of passion' it could not convict of murder," and that the prosecution improperly argued that the jury must decide Mr. Bland's guilt on the murder charge before it could consider the manslaughter charge. R. Doc. 18, at 27. In response, the State argued that Mr. Bland did not exhaust state remedies for his challenge to the jury instructions. Mr. Bland replied that the jury instruction argument was exhausted because it is the "substantial equivalent" to, "arose under the same federal constitutional provision" as, and "was a logical extension" of, the argument made to the OCCA. R. Doc. 33, at 2. The district court agreed, and found that Mr. Bland "fairly raise[d] the issue of whether the jury instructions given, combined with [the] prosecutorial argument made, misled the jury concerning the prosecution's burden of proof." R. Doc. 61, at 9. The district court nonetheless denied relief because the jury instructions clearly set forth the various offenses for which Mr. Bland could have been convicted, and the prosecutor's comments did not infringe on a particular constitutional right. *Id.* at 10-11. On appeal, the State reasserts its claim that Mr. Bland failed to present his jury instruction claim to the OCCA.

*1. Exhaustion*

A state prisoner generally must exhaust available state-court remedies before a federal court can consider a habeas corpus petition. *See* 28 U.S.C. § 2254(b)(1)(A); *Hawkins v. Mullin*, 291 F.3d 658, 668 (10th Cir. 2002). A claim has been exhausted when it has been "fairly presented" to the state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971). "Fair presentation" requires more than presenting "all the facts necessary to support the federal claim" to the state court or articulating a "somewhat similar state-law claim." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). "Fair presentation" means that the petitioner has raised the "substance" of the federal claim in state court. *Picard*, 404 U.S. at 278. The petitioner need not cite "'book and verse on the federal constitution,'" *id.* (quoting *Daugharty v. Gladden*, 257 F.2d 750, 758 (9th Cir. 1958)), but the petitioner cannot assert entirely different arguments from those raised before the state court. For example, in *Hawkins*, 291 F.3d at 669, the defendant argued on direct appeal that the trial court erred in not considering whether he knowingly and voluntarily waived the opportunity to present mitigating evidence. In his request for federal habeas corpus relief, however, he argued that trial counsel was ineffective in failing to investigate possible mitigating evidence. *Id.* We held that he had failed to exhaust that claim because "[w]hile [the defendant's] state-court claims focused on the *trial court's* actions" his federal habeas claims "specifically challenge[d] only *defense counsel's* failings." *Id.* (emphasis added).

-15-

Mr. Bland's arguments on direct appeal were limited to objections to the prosecution's mischaracterization of jury instructions directing the jury to consider the murder and manslaughter charges simultaneously. In the course of that argument, Mr. Bland not only neglected to argue that the trial court's instructions were erroneous, but explicitly conceded that the instructions comported with *McCormick*. His due process argument before the OCCA was limited to "misinformation presented by the prosecution" and did not mention any errors by the court in issuing its written jury instructions. Br. of Appellant, OCCA Case No. F-98-152, at 35.

Mr. Bland contends that the OCCA examined the jury instructions and held that the instructions satisfied *Mullaney*, and that because the court addressed the claim it was exhausted. *See Abdus-Samad v. Bell*, 420 F.3d 614, 623 (6th Cir. 2005) ("A claim is exhausted if the state court addressed the substance of the asserted claim."). We do not agree. Although the OCCA did note that "[t]he jury was properly instructed as to the manner in which the offenses were to be considered," this comment was in connection with the court's consideration of whether the prosecutor's comments had the effect of preventing the jury from following the trial court's instructions. *See id.* A challenge to the actions of the prosecution differs significantly from a challenge to the instructions given by the court. *See Hawkins*, 291 F.3d at 669. Because presentation of a "somewhat similar" claim is insufficient to "fairly present" a federal claim before the state

-16-

courts, we conclude, contrary to the district court, that Mr. Bland failed to exhaust his *Mullaney* claim.

Generally, a federal court should dismiss unexhausted claims without prejudice so that the petitioner can pursue available state-court remedies. *See Demarest v. Price*, 130 F.3d 929, 939 (10th Cir. 1997). However, "if the court to which Petitioner must present his claims in order to meet the exhaustion requirement would now find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review." *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir. 1992). There is no question that Oklahoma would deem Mr. Bland's due process claim regarding the jury instructions procedurally barred. Oklahoma's Uniform Post-Conviction Procedure Act requires that "[a]ll grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised . . . may not be the basis for a subsequent application." Okla. Stat. tit. 22, § 1086; *see also Medlock v. Ward*, 200 F.3d 1314, 1323 (10th Cir. 2000) ("Oklahoma deems waived claims that were not raised in an initial application for post-conviction relief in a death penalty case.").

A petitioner may overcome the procedural bar only if he can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750

-17-

(1991). Mr. Bland has neither asserted cause and prejudice excusing this default, nor suggested that this Court must review the merits of his claim to prevent a fundamental miscarriage of justice. Accordingly, Mr. Bland failed to exhaust his claim that the jury instructions violated *Mullaney* and he is now procedurally barred from raising that claim in this Court.

### 2. The Instructions

Even were we to agree with the district court that Mr. Bland raised his *Mullaney* claim before the OCCA, he would not be entitled to relief. In arguing that he exhausted this claim, Mr. Bland takes the position that "the state court confronted squarely the appropriateness of the written jury instructions challenged here." Reply Br. of Pet./Aplt. 5. If he is correct, then the OCCA rejected Mr. Bland's *Mullaney* claim on the merits, the standard of review in § 2254 applies, and we could reverse only if the OCCA's decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court.

*Mullaney* involved a challenge to a Maine murder statute that allowed any intentional or criminally reckless killing to be punished as murder "unless the defendant proves by a fair preponderance of the evidence that it was committed in the heat of passion on sudden provocation, in which case it is punished as manslaughter." *Mullaney*, 421 U.S. at 691-92. The Court declared the statute unconstitutional because "the Due Process Clause requires the prosecution to

-18-

prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.* at 704. Two years after issuing the decision in *Mullaney*, however, the Supreme Court clarified that its holding should be narrowly construed. In *Patterson v. New York*, 432 U.S. 197, 214 (1977), the defendant argued that *Mullaney* prohibited a state from permitting guilt or punishment "to depend on the presence or absence of an identified fact without assuming the burden of proving the presence or absence of that fact, as the case may be, beyond a reasonable doubt." The Court rejected that interpretation. Although it acknowledged that *Mullaney* requires a state to prove "every ingredient of an offense beyond a reasonable doubt" and prohibits a state from "shift[ing] the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense," the Court declared it "unnecessary" to have gone further in *Mullaney*. *Id.* at 215. *Patterson* thereby limited *Mullaney* to situations where a fact is presumed or implied against a defendant. *See id.* at 216; *United States v. Molina-Uribe*, 853 F.2d 1193, 1203-04 (5th Cir. 1988), *overruled in part on other grounds by United States v. Bachynsky*, 934 F.2d 1349 (5th Cir. 1991) (en banc). Because the written instructions did not permit the jury to presume malice aforethought, required the State to prove malice aforethought beyond a reasonable doubt, and defined malice and heat of passion as mutually exclusive, the instructions provided to the jury in Mr. Bland's case did not violate *Patterson*. *See Davis v. Maynard*, 869 F.2d

-19-

1401, 1406-07 (10th Cir. 1989) (rejecting a *Mullaney* challenge to substantially similar jury instructions), *vacated sub nom.*, *Saffle v. Parks*, 494 U.S. 484 (1990), *opinion reinstated in part*, 911 F.3d 415 (10th Cir. 1990) (per curiam).

Mr. Bland relies on our decision in *Lofton*, 776 F.2d at 920, to claim that he was entitled to an instruction that the prosecution had the burden to prove the absence of heat of passion beyond a reasonable doubt. In *Lofton*, we described *Patterson* as preserving, not limiting, *Mullaney*'s holding that the government must prove beyond a reasonable doubt the absence of any defense that serves to negate an element of the crime. *See id.* (noting that under the statute in *Patterson*, malice was not an element of second-degree murder, and the affirmative defense of extreme emotional disturbance therefore did not negate an element of the offense). We held that where malice is an element of murder and a heat-of-passion defense would negate that element, as in *Mullaney*, the defendant "is entitled to instructions informing the jury of . . . the Government's duty to prove beyond a reasonable doubt the absence of heat of passion in order to obtain a murder conviction." *Id.*

If this Court's decision in *Lofton* were controlling, Mr. Bland might well be entitled to relief. Under the AEDPA standard of review, however, a habeas petition shall not be granted unless the state-court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*." 28 U.S.C. § 2254(d)(1)

(emphasis added).  The decisions of lower federal courts applying Supreme Court precedent are not determinative, *see Williams*, 529 U.S. at 406, and in this case the lower federal courts have in fact divided as to the proper scope of *Mullaney* after *Patterson*.  *Compare Lofton*, 776 F.2d at 920-21, *with Molina-Uribe*, 853 F.2d at 1203-04.  Because the OCCA's decision reasonably applies the correct legal rule from *Mullaney*, as the Supreme Court construed that rule in *Patterson*, the OCCA decision is neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, notwithstanding the interpretation of that rule in this Circuit.

*3. Prosecutorial Misstatements*

We turn now to Mr. Bland's argument that the prosecutors misstated the jury instruction regarding the lesser included offense, and thus violated due process.  To prevail on a claim based on improper remarks by the prosecutor, a petitioner generally must demonstrate that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristophoro*, 416 U.S. 637, 643 (1974); *see also Le v. Mullin*, 311 F.3d 1002, 1013, 1018 (10th Cir. 2002) (requiring a showing that the trial was "fundamentally unfair" where the prosecutor's comments appeared to contradict the jury instructions).  Because the OCCA considered this claim, AEDPA standards of review apply, and we may reverse only if the OCCA's decision was

"legally or factually unreasonable." *Gipson v. Jordan*, 376 F.3d 1193, 1197 (10th Cir. 2004) (internal quotation marks omitted).

During closing argument, the prosecution argued that the jury need not consider the lesser included offense of first-degree manslaughter if the jury found beyond a reasonable doubt that the defendant is guilty of first-degree murder. Tr. Jury Trial, Day Six, at 8, 10. The defense did not object to the argument at trial, but Mr. Bland now contends that the argument violated Oklahoma law and misstated the jury instructions by inviting the jury first to consider the murder charges and "then only look at the manslaughter" if the jury was unable to find murder beyond a reasonable doubt. *Id.* at 106.

Reviewing for plain error, the OCCA found none. Both defense counsel and the prosecution reminded the jury to refer to the written instructions during deliberations. *See id.* at 9 (State's closing argument) ("Read the Instructions, study them."); *id.* at 59 (Defendant's closing argument) ("I want you back in the jury room[,] as I know you will[,] to read all of the instructions."). Mr. Bland has conceded that the written instructions provided to the jury were in accord with *McCormick*, the controlling OCCA precedent. *See Bland*, 4 P.3d at 726; Br. of Appellant, OCCA Case No. F-98-152, at 34. One instruction provided that "[i]f you have a reasonable doubt of the defendant's guilt of the charges of MURDER FIRST DEGREE (PREMEDITATED) AND MURDER FIRST DEGREE (FELONY MURDER), you must then consider the charge of MANSLAUGHTER

-22-

FIRST DEGREE BY DANGEROUS WEAPON (HEAT OF PASSION)." O.R.

Vol. II, at 374. Another instruction explained:

> If you have a reasonable doubt as to which offense the defendant
> may be guilty of, Murder First Degree (Premeditated), and/or Murder
> First Degree (Felony Murder), or Manslaughter First Degree by
> Dangerous Weapon (Heat of Passion), you may find him guilty only
> of the lesser offense, Manslaughter First Degree by Dangerous
> Weapon (Heat of Passion).

*   *   *

> If you find the defendant guilty of one or both of the charges of
> Murder First Degree . . . , then you may not also render a verdict on
> the lesser offense of Manslaughter First Degree by Dangerous
> Weapon (Heat of Passion).

*Id.* at 381. Based on its review of the record, the OCCA found no evidence that

the jury did not follow the written instructions. *Bland*, 4 P.3d at 726. Moreover,

the OCCA concluded that the prosecutor's comments "were not so egregious as to

have denied [Mr. Bland] a fair trial or to have affected the outcome of the trial."

*Id.*

We have carefully examined the record in light of petitioner's arguments,

and cannot say that the OCCA's decision was contrary to, or involved an

unreasonable application of, clearly established federal law, as reflected in the

decisions of the United States Supreme Court. Although the prosecutor in this

case did misstate the jury instructions, both defense counsel and the prosecution

reminded the jury that it should refer to the written instructions during

deliberations. The jury is presumed to follow its instructions, *Weeks v. Angelone*,

-23-

528 U.S. 225, 234 (2000), even when there has been misleading argument. *See Boyde v. California*, 494 U.S. 370, 384 (1990) (explaining that "arguments of counsel generally carry less weight with a jury than do instructions from the court"); *Lingar v. Bowersox*, 176 F.3d 453, 460-61 (8th Cir. 1999) ("When counsel misstates the law, the misstatement is harmless error if the court properly instructs the jury on that point of law or instructs that the attorneys' statements and arguments are not evidence."). Furthermore, there was strong evidence that Mr. Bland was guilty of malice-aforethought murder rather than heat-of-passion manslaughter: that Mr. Bland's grievances against the victim were long-standing, that he told his girlfriend he was going to murder Mr. Rains months before doing so, that he went to Mr. Rains's home with a .22-caliber rifle hidden in his coveralls, that he shot Mr. Rains in the back of the head, that he stole money from Mr. Rains, and that he took elaborate steps to hide the body, much as he had told his girlfriend he would. In light of these considerations, the OCCA's decision was not an unreasonable application of clearly established federal law.

**B. *Jury Instruction on Manslaughter by Resisting a Criminal Attempt***

Oklahoma provides three definitions for first-degree manslaughter: misdemeanor-manslaughter, heat of passion manslaughter, and manslaughter by resisting a criminal attempt. Okla. Stat. tit. 21, § 711. Manslaughter by resisting a criminal attempt occurs when a homicide is "perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such

attempt shall have failed." *Id.* § 711(3). The defense did not request such an instruction at trial, but Mr. Bland now contends that there was sufficient evidence to support such an instruction and that the trial court's failure to give it *sua sponte* violated his right to due process as defined by *Beck v. Alabama*, 447 U.S. 625, 627 (1980). He also argues that the OCCA improperly applied a new and more exacting standard to determine whether he was entitled to this instruction.

Mr. Bland raised the trial court's failure to issue an instruction for manslaughter by resisting a criminal attempt on direct appeal of his conviction to the OCCA. The OCCA rejected the argument. Clarifying prior holdings of that court, which had been in disarray, the OCCA held that a jury instruction on a lesser included offense is warranted only when *prima facie* evidence has been presented to support the lesser offense. *Bland*, 4 P.3d at 719-20. It then found that there was insufficient evidence in this case to warrant such an instruction. *Id.* at 720. The OCCA noted that the only evidence supporting the instruction was self-serving testimony by Mr. Bland that he killed Mr. Rains to prevent the latter from assaulting him, and that testimony was inconsistent with other evidence showing that Mr. Rains was shot in the back of the head, "suggest[ing] the victim had turned away from" Mr. Bland. *Id.* Mr. Bland filed a petition for rehearing before the OCCA arguing that the new *prima facie* evidence standard violated the principles in *Beck* as well as longstanding Oklahoma law. District Ct. App. Vol. I, at 464-67. The OCCA rejected this claim in its order denying

rehearing, holding that the *prima facie* evidence standard "is not inconsistent" with *Beck* or Oklahoma case law. *Id.* at 37.

In his habeas petition before the district court, Mr. Bland argued both that the trial court's failure to provide an instruction on manslaughter by resisting a criminal attempt violated *Beck*, and that the OCCA's adoption of the new *prima facie* standard violated Mr. Bland's due process rights as a judicial *ex post facto* violation. R. Doc. 18, at 39, 82 (citing *Devine v. N.M. Dep't of Corr.*, 866 F.2d 339, 342 (10th Cir. 1989)). The district court did not consider Mr. Bland's claim under *Beck*, but it rejected Mr. Bland's *ex post facto* argument on the ground that it involved a matter of state law inappropriate for relief under § 2254. Mr. Bland renews both objections in his appeal to this Court.

In *Beck*, the Supreme Court held that "a sentence of death [may not] constitutionally be imposed . . . when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Beck*, 447 U.S. at 627 (internal quotation marks omitted). This rule is designed to eliminate the "distortion of the factfinding process" that occurs "when the jury is forced into an all-or-nothing choice between capital murder and innocence." *Spaziano v. Florida*, 468 U.S. 447, 455 (1984). However, the Supreme Court has held that the rule is not implicated when the court instructs the jury on one lesser included offense supported by the evidence, even if instructions on other lesser included offenses

might have been warranted. *Schad v. Arizona*, 501 U.S. 624, 647-48 (1991); *see Willingham v. Mullin*, 296 F.3d 917, 923-24 (10th Cir. 2002).

The jury at Mr. Bland's trial was instructed on the lesser included offense of first-degree heat-of-passion manslaughter. Mr. Bland does not dispute that there was evidentiary support for heat-of-passion manslaughter. Accordingly, even if the trial court's failure to provide the additional manslaughter instruction violated state law, which is an issue we lack jurisdiction to consider under 28 U.S.C. § 2254(a), it did not violate *Beck*, "as the jury had the option of at least one lesser included offense." *James v. Gibson*, 211 F.3d 543, 555 (10th Cir. 2000). Accordingly, the OCCA's decision was not contrary to, and did not involve an unreasonable application of, *Beck*.

We turn now to Mr. Bland's *ex post facto* argument. Article I, Section 10, Clause 1 of the United States Constitution prohibits states from passing any "ex post facto Law." An *ex post facto* law is any law that, among other things, "deprives one charged with crime of any defense available according to law at the time when the act was committed." *Beazell v. Ohio*, 269 U.S. 167, 169-70 (1925). Although "[t]he *Ex Post Facto* Clause is a limitation upon the powers of the Legislature and does not of its own force apply to the Judicial Branch," *Marks v. United States*, 430 U.S. 188, 191 (1977) (internal citation omitted), the Supreme Court has applied this rule equally to state supreme courts through the Due Process Clause of the Fourteenth Amendment, *see Bouie v. City of Columbia*,

378 U.S. 347, 353-54 (1964) ("If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."). In challenging the OCCA's adoption of a new standard for determining when a defendant is entitled to an instruction on a lesser included offense, Mr. Bland argues that the decision deprived him of a defense to which he would have been entitled under the law as it existed at the time of his offense.

Prior to its decision upholding Mr. Bland's conviction, the OCCA had enunciated somewhat different standards for determining whether evidence warranted an instruction on a lesser homicide offense. *See Bland*, 4 P.3d at 719. Initially, the standard was "whether there is *any evidence* that would tend to reduce the degree of the offense." *Tarter v. State*, 359 P.2d 596, 601 (Okla. Crim. App. 1961) (original emphasis omitted, new emphasis added) (quoting *Welborn v. State*, 105 P.2d 187 (Okla Crim. App. 1940)). In later cases, the OCCA gradually tightened the standard, holding that the instruction was warranted when "there is evidence that *tends to prove* the lesser included offense," *Rawlings v. State*, 740 P.2d 153, 160 (Okla. Crim. App. 1987) (emphasis added), whether "the evidence *in any reasonable view suggests*" the lesser offense, *Boyd v. State*, 839 P.2d 1363, 1367 (Okla. Crim. App. 1992) (emphasis added), or whether "the evidence *would permit the jury rationally to find* . . . the lesser offense," *Malone v. State*, 876 P.2d 707, 711-12 (Okla. Crim. App. 1994) (emphasis added). Finally, in *Bland*, 4

P.3d at 719-20, the OCCA "clear[ed] up any confusion caused by this prior case law" and announced that the trial judge must determine "whether *prima facie* evidence of the lesser offense has been presented to warrant the instruction." It defined *prima facie* evidence as "[e]vidence good and sufficient on its face," such that the evidence "is sufficient to establish a given fact . . . and which if not rebutted or contradicted, will remain sufficient . . . to sustain a judgment in favor of the issue which it supports." *Id.* (internal quotation marks omitted).

Mr. Bland claims that this new *prima facie* evidence standard is more stringent than the previous standards, and that it therefore deprived him of the opportunity to provide the jury with an additional non-capital offense on which to convict. We need not delve into this argument because, even under the earlier standard of *Malone*, 876 P.2d at 711-12, the evidence in the record did not support providing instruction on manslaughter by resisting a criminal attempt. The only evidence supporting such an instruction was Mr. Bland's own testimony that Mr. Rains assaulted him. That testimony was contradicted by the fact that Mr. Rains was shot in the back of the head, eliminating any rational inference that Mr. Bland was resisting assault at the time he shot Mr. Rains. It therefore did not matter whether the OCCA applied its earlier *Malone* standard or its new *prima facie* evidence standard; Mr. Bland was not entitled to the defense under either standard. The OCCA's rejection of Mr. Bland's *ex post facto* argument therefore

was not contrary to, and did not involve an unreasonable application of, clearly

established Supreme Court precedent.

## C. Argument Diminishing the Jury's Sense of Responsibility

Mr. Bland next claims that comments made during the prosecution's

closing argument at the sentencing phase of the trial diminished the jury's sense

of responsibility for imposing the death penalty, in violation of *Caldwell v.*

*Mississippi*, 472 U.S. 320, 328-29 (1985). He points in particular to two

arguments. During his closing argument, one prosecutor argued:

> Their attorney tells you that we want you to kill him. Let's get one
> thing straight. I didn't ask to be here, you didn't ask to be here. If
> he gets the death penalty you don't kill him and I don't kill him.
> He's put himself in that position by what he's done and by what he's
> done in the past. He's forced me, he's forced [the other prosecutor],
> he's forced you and I because of what he did and who he is to decide
> under the law whether he qualifies for and deserves the death
> penalty. There is nothing sinister or shameful about that. The death
> penalty is perfectly legal and a [sic] appropriate punishment under
> the State laws, you have to decided [sic] whether this case and this
> Defendant merit the death penalty. If you so decide then you haven't
> killed anybody, you've simply followed the law that the Court set out
> for you.

Tr. Jury Trial, Day Seven, at 160. In a separate closing argument another

prosecutor argued:

> If the Defendant gets the death penalty it's not you or I that kill him.
> . . . He's the one that's forced you and I because of what he did and
> who he is to be in this position that we're in today. . . . Ladies and
> gentlemen, there is nothing shameful about that, about having to
> make that decision. The death penalty is a perfectly legal and
> appropriate sentence under the laws of the State of Oklahoma. And
> you must decide whether this case and this Defendant merits [sic] the

-30-

death penalty. And if you so decide that then you are here in this position not because of anything that you or I have done, but because this Defendant chooses not to live by the rules of society and the laws of the State of Oklahoma. You will not have killed anyone. You will simply have followed the law that the Court has given you, nothing more and nothing less.

*Id.* at 192-94. The defense did not object to either argument at trial, but Mr. Bland contended on direct appeal that these arguments violated *Caldwell*.

Reviewing for plain error, the OCCA rejected this argument because "the prosecutor never intimated in any way that the ultimate responsibility for determining the proper sentence rested anywhere other [than] the jury." *Bland*, 4 P.3d at 727. The district court likewise denied Mr. Bland's request for habeas corpus relief on this claim, finding that the prosecutor's comments, viewed as a whole, did not mislead jurors or attempt to diminish their responsibility for a death sentence.

Under *Caldwell*, a death sentence is unconstitutional if the determination was "made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29. In reviewing a prosecutor's closing argument, however, we place isolated comments within the context of the entire closing argument to determine whether the jury has been misled about its role in rendering a death verdict. *See Neill v. Gibson*, 278 F.3d 1044, 1059 (10th Cir. 2001). It is therefore significant that, in addition to the remarks quoted above,

the first prosecutor also said: "You, the Jury, have the final say. You're the people on whether [sic] this unsuspecting world is kept safe from Jimmy Dale Bland. It's a sobering thought considering having to assess the death penalty." *Id.* at 164. The second prosecutor reminded the jury, "[y]ou decide what the price is for shooting a defenseless sixty two year old man in the back of the head," *id.* at 197, and clarified that "[y]ou have the final say on whether Tillman County and the world is [sic] kept safe from Jimmy Bland in the future," *id.* at 198.

Viewing the prosecutors' arguments in context, we do not believe that they violated *Caldwell*—let alone that the OCCA's conclusion was contrary to, or involved an unreasonable application of, *Caldwell*. At worst, the prosecutors' comments may have suggested that Mr. Bland was responsible for his own predicament. That was not the vice of *Caldwell*: in that case, the jury was induced to believe that some other governmental decisionmaker would ultimately decide, and bear the responsibility for deciding, whether the defendant should be executed. *See Caldwell*, 472 U.S. at 325-26. Nothing in *Caldwell* suggests that there is anything wrong with a jury being reminded that capital punishment is ultimately a result of the defendant's own actions. *See Coleman v. Brown*, 802 F.2d 1227, 1240-41 (10th Cir. 1986) (distinguishing between the argument in *Caldwell*, which suggested to the jury that "someone else now has *control* over the defendant's fate," and an argument that brings into focus "that defendant is responsible for his own plight"). Likewise, the prosecutor's comment that the

-32-

jury, in rendering a death verdict, would "simply have followed the law" did not

alleviate the jury's ultimate responsibility for rendering a death verdict. *See*

*Parks v. Brown*, 860 F.2d 1545, 1549 (10th Cir. 1988) (en banc) (finding that the

prosecution's statement that "[s]o all you are doing is you're just following the

law, and what the law says . . . . The law does all of these things, so it's not on

your conscience" did not reduce the jury's sense of responsibility for rendering a

death sentence), *rev'd on other grounds sub nom.*, *Saffle v. Parks*, 494 U.S. 484

(1990).

That the prosecutors' remarks did not diminish the jury's sense of ultimate

responsibility is especially evident when these statements are placed in the

context of the entire sentencing phase. *See id*. at 1550 ("In evaluating the

challenged statements, it is necessary to examine the context in which they were

made."). The prosecution's opening statement emphasized to the jurors that they

could "assess a penalty of death if you feel it is the appropriate punishment for

what the Defendant did." Tr. Jury Trial, Day Seven, at 19. Defense counsel also

argued that the decision to impose a death sentence fell to the jury and that jurors

"can't ever say the law made [them] do or the Judge made [them] do it, or the

prosecution made [them] do it." *Id*. at 181. Even the prosecutors' closing

arguments had an underlying theme that the jury, and no one else, must make the

decision to impose a death sentence. *See id*. at 164, 197-98. Finally, the

instructions provided to the jury underscored the jury's responsibility in rendering

a verdict: "It is now your duty to determine the penalty to be imposed for this offense." O.R. Vol. III, at 394. Given these constant reminders that the jury was solely responsible for the sentence imposed, we cannot find that the prosecutors' isolated remarks diminished the jurors' sense of ultimate responsibility for the sentencing decision. The OCCA decision therefore was not contrary to, and did not involve an unreasonable application of, *Caldwell*.

### D. Mr. Bland's Absence from Individual Voir Dire

On the second day of jury selection, the trial court conducted a limited *voir dire* of thirty-two individual jurors in chambers. *Bland*, 4 P.3d at 712. Initially, questioning focused on five potential jurors who had expressed personal concerns about serving on the jury. *Id*. Of those five potential jurors, one was excused for cause because he was going through a divorce and did not think that he could concentrate on the case, and another was excused due to illness. Tr. Jury Trial, Day Two, at 4-7, 15. While in chambers, defense counsel expressed concern regarding potential jurors' awareness of pretrial publicity regarding Mr. Bland's previous conviction, which had aired on the local news the preceding evening. The court agreed to question the potential jurors individually, and inquired whether Mr. Bland's presence was required. *Id*. at 17. Defense counsel stated that Mr. Bland's presence was not required. Potential jurors were individually called into chambers and questioned as to whether they watched the news or heard about any news reports involving the case. *See Bland*, 4 P.3d at 712. Only one

potential juror was excused because he learned, from an inaccurate news report, that Mr. Bland had a prior murder conviction. *Id.* at 712-13. The remaining potential jurors returned to the courtroom and *voir dire* was conducted in open court, with Mr. Bland present and able to exercise his peremptory challenges. *Id.* at 713.

Despite defense counsel's explicit statement to the trial court that Mr. Bland's presence was not required during the in-chambers questioning, Mr. Bland now contends that his absence violated his right to be present at all critical stages of the trial under *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934), *overruled in part on other grounds by Malloy v. Hogan*, 378 U.S. 1 (1964). Mr. Bland raised this argument on direct appeal to the OCCA, which rejected it on the ground that Mr. Bland's "absence from the brief, limited, individual *voir dire* was neither a due process nor statutory violation," and that even if there was error, "[a]ny error in conducting the individual *voir dire* in [his] absence was harmless beyond a reasonable doubt." *Bland*, 4 P.3d at 713. The district court, deferring to the OCCA's decision, likewise rejected Mr. Bland's challenge.

Although a defendant has a due process right "to be present . . . whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," this right does not require that a defendant be present at all proceedings. *Snyder*, 291 U.S. at 105-06. Instead, the constitutional right to be present exists "to the extent that a fair and just hearing

-35-

would be thwarted by his absence, and to that extent only." *Id.* at 107-08. For example, a defendant need not be present during all communications between a judge and a juror. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (holding that a defendant's absence during an *in camera* discussion between the judge and a juror to ascertain bias did not violate the defendant's right to due process). When the defendant's "presence would be useless, or the benefit but a shadow," due process does not require the defendant's presence at a trial proceeding. *Snyder*, 291 U.S. at 106-07. In determining whether exclusion of a defendant from a proceeding violated due process, we consider the proceedings "in light of the whole record." *Gagnon*, 470 U.S. at 526-27. Because in this individual *voir dire* the judge conducted all questioning himself and personally determined whether each juror should be excused for cause, Mr. Bland's presence could not have had any effect on the outcome, rendering his presence "useless" or a mere "shadow." *See Snyder*, 291 U.S. at 106-07; *Gagnon*, 470 U.S. at 527.

Mr. Bland also contends that he was prejudiced because he was unable to observe potential jurors and challenge them "simply on the basis of sudden impressions or personal knowledge indispensable to the selection of an impartial jury." *Bland*, 4 P.3d at 712. This is not enough to establish a constitutional violation. *See Gagnon*, 470 U.S. at 527; *United States v. Santiago*, 977 F.2d 517, 522-23 (10th Cir. 1992) (finding that a defendant's absence from an *ex parte*

discussion with a juror was not fundamentally unfair even though the defendant could not observe juror's potential bias). Considering Mr. Bland's absence from individual *voir dire* in light of the entire jury selection process, Mr. Bland had ample opportunity to observe jurors during *voir dire* and exercise peremptory challenges accordingly. His absence during these limited proceedings did not infringe on his right to due process, and the OCCA's decision was therefore not contrary to, and did not involve an unreasonable application of, clearly established federal law.

## E. Comments on Post-Arrest Silence

Mr. Bland also challenges several prosecutorial comments on his post-arrest silence, which were introduced to impeach his story that he committed the murder in the heat of passion. During cross-examination the prosecutor engaged in the following dialogue with Mr. Bland:

Q:   Do you remember when Agent Briggs came and arrested you in the, Mike Baker's house, don't you?

A:   Yes, sir. I do.

Q:   Why were you hiding in the closet?

A:   Because they were trying, they were knocking on the door and they were saying it was a police officer and I was trying to hide.

Q:   You didn't feel at that point that you needed to tell them how this all happened and explain it?

A:   No, sir. I was still scared.

Q:     You were still running, weren't you?

A:     Yes, sir.

Q:     Well, I'm sure that when Agent Briggs got you out of the closet the first thing you wanted to tell him was the circumstances, why this happened, that you didn't intend to kill Windle?

Tr. Jury Trial, Day Five, at 72. In closing argument, the prosecutor referred to Mr. Bland's silence on several occasions. He rhetorically inquired:

Why didn't he call the Sheriff, why didn't he tell Trooper Fisher when he found him in Chandler[?] . . . Did he ever call the cops and tell them how Windle attacked him? . . . In Oklahoma City an O.S.B.I. agent finally shows us and does he say, gosh, Mr. Briggs, I had this real important story to tell you about how this guy attacked me. No . . . . Not for four hours he doesn't say anything . . . .

Tr. Jury Trial, Day Six, at 31-32. The prosecutor also used Mr. Bland's silence to label him a liar. *See id.* at 35-36 ("Now who do you think is lying? . . . It's the same person who's been lying all along, he lied to his mother, he lied to Agent Goss and who didn't tell anything to Agent Briggs or to any of the other police officers."); *id.* at 39 ("He was still lying when he spoke with Inspector Goss. Telling first nothing, then only a version that would help him make some self defense claim."); *id.* at 95-96 ("[I]f that's really what happened, if that's really his story then how do you explain his silence once Agent Briggs arrested him?").

Defense counsel objected to the prosecution's use of post-arrest silence in closing argument and requested a mistrial. *Id.* at 95-96. The trial court sustained the objection and admonished the jury to disregard the "the comments of counsel

-38-

in regard to the Defendant's silence or non-silence prior to his beginning to make the voluntary statement to Agent Goss," but overruled counsel's request for a mistrial. *Id.* at 96-97. In his direct appeal to the OCCA, Mr. Bland argued that the trial court erred in failing to grant a mistrial. The OCCA denied relief, finding that the error was cured by the trial court's admonition to the jury. *Bland*, 4 P.3d at 730. The district court found that the OCCA's decision was not unreasonable due to the substantial evidence indicating guilt and the trial court's order sustaining the objection and issuing a curative instruction.

The State contends here, as it did in the district court, that the comments on post-arrest silence were not only harmless but also that they did not violate Mr. Bland's right to due process as defined by *Miranda v. Arizona*, 384 U.S. 436 (1966). Witnesses who testify in court, including criminal defendants, may generally "be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) (permitting prosecutorial comment on pre-arrest silence). One exception to this rule is "where the government ha[s] induced silence by implicitly assuring the defendant that his silence would not be used against him," such as after the issuance of *Miranda* warnings. *Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam); *see also Doyle v. Ohio*, 426 U.S. 610, 618 (1976) (holding that commenting on a defendant's post-arrest, post-*Miranda* silence violates due process). However, "[i]n the absence of the sort of affirmative

assurances embodied in the *Miranda* warnings," the Supreme Court has held that it does not "violate[] due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Fletcher*, 455 U.S. at 607.

Most comments made by the prosecution at Mr. Bland's trial are analogous to those made in *Fletcher*. In *Fletcher*, the defendant testified on his own behalf that he did stab the victim, but claimed (for the first time) that he acted in self-defense and that the stabbing was accidental. *Id.* at 603-04. On cross-examination, the prosecutor asked why he had failed to assert his exculpatory explanation upon arrest. *Id.* at 607. The Court found no due process error in the prosecutor's questions because the prosecution used only post-arrest, pre-*Miranda* silence. Here, the prosecution repeatedly referred to Mr. Bland's pre-arrest and post-arrest, pre-*Miranda* silence by asking Mr. Bland why he did not tell his mother, Trooper Fisher, or arresting officer Agent Briggs about his confrontation with Mr. Rains. Under *Fletcher*, those statements, and references to them in closing argument, did not violate Mr. Bland's right to due process.

Only one comment made by the prosecution during closing argument referred to Mr. Bland's post-*Miranda* silence, in violation of *Doyle*, 426 U.S. at 618. In an isolated remark, the prosecutor said, "He was still lying when he spoke with Inspector Goss. Telling first nothing, then only a version that would

help him make some self defense claim." Tr. Jury Trial, Day Six, at 39. The OCCA found this error harmless. *Bland*, 4 P.3d at 730.

When reviewing a state court's determination of harmlessness, we ask whether the challenged comments had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638 (internal quotation marks omitted). We consider five factors in assessing harmlessness under *Brecht*: "(1) the prosecutor's use of the post-arrest silence; (2) whether the defense or prosecution pursued this line of questioning; (3) the amount of evidence indicating guilt; (4) the frequency and force of the reference; and (5) if the defense requested a mistrial or curative instructions." *Sallahdin v. Gibson*, 275 F.3d 1211, 1230-31 (10th Cir. 2002). Of these, the first and third factors are the most important. *Id.* at 1231.

The prosecutor's comment on Mr. Bland's post-*Miranda* silence in his conversation with Inspector Goss was made not as an argument to establish Mr. Bland's guilt, but to impeach Mr. Bland's story that he killed Mr. Rains in the heat of passion after an argument. Such use was consistent with the prosecution's attempt to discredit Mr. Bland's story based on the lies he told to his mother and his repeated failure to tell the police about the homicide, even before his arrest. Furthermore, excluding commentary on Mr. Bland's post-*Miranda* silence, there was substantial evidence establishing Mr. Bland's guilt on the first-degree malice aforethought murder charge. Mr. Bland shot Mr. Rains in the back of the head,

suggesting that Mr. Rains had turned away from Mr. Bland at the time Mr. Bland fired. Mr. Bland attempted to cover up the crime by meticulously cleaning the crime scene and hiding Mr. Rains's body in a creek, covered with logs, so that no one would find it. He lied to his mother about going to work with Mr. Rains the next day so that she would not suspect anything had happened to Mr. Rains. The single, isolated reference to Mr. Bland's post-*Miranda* silence could not have affected the jury's verdict, considering the substantial evidence supporting the verdict and the trial court's curative instruction directing the jury to disregard the prosecutor's comments on Mr. Bland's silence. Thus, we agree with the OCCA that any error was harmless.

## F. Claims of Prosecutorial Misconduct

Mr. Bland next argues that several of the prosecutors' remarks deprived him of a fair trial at both stages of his trial. In addition to the prosecution's role in the errors alleged above, he raises six additional claims of prosecutorial misconduct: (1) improperly arguing that he is a liar; (2) demeaning and ridiculing him; (3) demeaning his mitigating evidence; (4) telling the jury it had a civic and moral duty to convict and sentence him to death; (5) urging a death sentence based on sympathy for the victim; and (6) arguing facts not in evidence. Mr. Bland contends not only that each instance of misconduct is sufficient to violate his right to due process, but that even if each comment is found to be harmless, the cumulative effect of the errors warrants relief.

The OCCA rejected each of Mr. Bland's claims of prosecutorial misconduct on the merits. The court found that it was not improper for the prosecution to comment on the veracity of Mr. Bland's testimony by calling him a liar, and that the prosecution did not improperly demean the mitigating evidence, suggest that the jury's only moral course was to return a conviction, or evoke sympathy for the victim. *Bland*, 4 P.3d at 727-28. Although the OCCA did note that the prosecution inappropriately compared the plight of the victim to Mr. Bland's life in prison and that the prosecutorial argument ridiculing Mr. Bland "tested the bounds of proper argument," it deemed both errors harmless based on the substantial evidence supporting the jury's verdict. *Id.* at 728. Likewise, the OCCA held that even if the prosecution did erroneously argue facts not in evidence, "[a]ny misstatement could not have affected the outcome of the trial." *Id.*

In rejecting Mr. Bland's claim of prosecutorial misconduct, the OCCA applied the standard for adjudicating allegations of prosecutorial misconduct set forth in its prior decisions. *Id.* at 729 (citing *Duckett v. State*, 919 P.2d 7, 19 (Okla. Crim. App. 1995), for the proposition that "[a]llegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect was such [as] to deprive the defendant of a fair trial") (internal quotation marks omitted). Because this standard is the same as that under federal law, *see Patton v. Mullin*, 425 F.3d 788, 811 (10th Cir. 2005), we apply the deferential AEDPA

-43-

standard of review, and examine whether the OCCA's decision was an unreasonable application of the standard.

Where prosecutorial misconduct does not implicate a specific constitutional right, improper remarks require reversal of a state conviction only if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. To determine whether a trial is rendered fundamentally unfair, we examine the entire proceeding, "including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase" as well as "[a]ny cautionary steps—such as instructions to the jury—offered by the court to counteract improper remarks." *Le*, 311 F.3d at 1013. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted). The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct. Having already considered those claims of prosecutorial misconduct that infringed on a specific constitutional right and were not subject to the fundamental fairness test, *see Paxton v. Ward*, 199 F.3d 1197, 1217 (10th Cir. 1999), we now consider whether the other allegations of prosecutorial misconduct, individually or cumulatively, deprived Mr. Bland of a fair trial.

   1. *Characterizing Mr. Bland as a Liar*

Mr. Bland argues that it was inappropriate for the prosecution during closing argument in the guilt phase of trial to refer to him as a liar. Although labeling a defendant a "liar" is often "unnecessary" and "unwarranted," *United States v. Nichols*, 21 F.3d 1016, 1019 (10th Cir. 1994), we have held that referring to testimony as a lie is not *per se* prosecutorial misconduct, *United States v. Robinson*, 978 F.2d 1554, 1567 (10th Cir. 1992). On the contrary, it is permissible for the prosecution to comment on the veracity of a defendant's story. *United States v. Hernandez-Muniz*, 170 F.3d 1007, 1012 (10th Cir. 1999). We have therefore rejected claims of prosecutorial misconduct where the prosecution referred to a defendant as a liar on account of irreconcilable discrepancies between the defendant's testimony and other evidence in the case. *See id.*; *Nichols*, 21 F.3d at 1019.

Here, the prosecution did not derive its characterization of Mr. Bland as a liar through inferences, but instead reminded the jury that Mr. Bland admitted during cross-examination that he lied to his mother and the authorities before putting forth the story he told in court. For example, in response to Mr. Bland's testimony that he did not take Mr. Rains's billfold, the prosecution argued:

> Simmons found him with a brown billfold with the money in it. Now who do you think is lying? I think you know. It's the same person who's been lying all along, he lied to his mother, he lied to Agent Goss and who didn't tell anything to Agent Briggs or to any of the other police officers. He's admitted he's lied. He got up here and told you he's lied. And now he's still lying about the billfold.

Tr. Jury Trial, Day Six, at 35-36.  The prosecution also challenged the credibility of Mr. Bland's testimony, arguing that Mr. Bland has "got a motive or reason to lie" to spare himself the death penalty.  *Id.* at 93.  These references to Mr. Bland's veracity, even if excessive, were permissible in light of Mr. Bland's own testimony.  The OCCA's rejection of this claim of prosecutorial misconduct therefore was not an unreasonable application of clearly established federal law.

*2. Demeaning and Ridiculing Mr. Bland*

During closing argument at both phases of trial, the prosecution referred to Mr. Bland as a "sniffling . . . coward[]," a "heartless and vicious killer," and a "violent and evil man."  Tr. Jury Trial Day Six, at 38; Tr. Jury Trial, Day Seven, at 165, 199.  These pejoratives were unnecessary and inappropriate.  *See Le*, 311 F.3d at 1021 ("Personal attacks by a prosecutor are improper.").  Nonetheless, in light of the overwhelming evidence supporting both aggravating factors and the relative dearth of evidence on mitigating circumstances, we agree with the OCCA that the comments did not deprive Mr. Bland of a fair trial.

In his closing argument, Mr. Bland conceded one aggravator—that he was previously convicted of a violent felony, namely kidnaping and first-degree manslaughter.  Tr. Jury Trial, Day Seven, at 179.  Mr. Bland has spent all but one year of his adult life in prison, and during that time he perpetrated two homicides. There was evidence that Mr. Bland abuses drugs and alcohol, and his expert psychiatrist, Dr. Sally Church, testified that substance abuse contributes to his

violent tendencies. *Id.* at 137. Although Mr. Bland presented testimony that he was never violent or threatening during his previous twenty years in jail, the prosecution revealed on cross-examination that the prison guard and prison counselor testifying were not very familiar with Mr. Bland's conduct in prison. *Id.* at 86, 93. Furthermore, there was evidence that Mr. Bland abused cocaine while in prison, *id.* at 93, which, as noted, contributes to his violent tendencies. In contrast, Mr. Bland's mitigating evidence was weak. Although the defense attempted to establish that Mr. Bland would be a good, non-violent prisoner, and sought to attribute his violence to unfortunate childhood events, there was little positive testimony regarding Mr. Bland's character because he had been out of prison for such a short period of time when he killed Mr. Bland. The OCCA's decision therefore did not unreasonably apply clearly established federal law.

*3. Demeaning the Mitigating Evidence*

Mr. Bland next claims that the prosecution improperly demeaned his mitigating evidence by suggesting that the jury ignore mitigating evidence and by recharacterizing the mitigating evidence as evidence in aggravation. Referring to various mitigating evidence, the prosecutor rhetorically asked, "Do we as a society or as a system of justice let those things act a [sic] shield from accepting the full responsibility for his actions[?]" Tr. Jury Trial, Day Seven, at 163. The prosecutor also referred to Mr. Bland's mitigating evidence as "excuses," and suggested that the difficulties in Mr. Bland's life, about which an expert testified,

-47-

were the "kind of things that make criminals out of ordinary citizens." *Id.* at 187.

As long as the jury is properly instructed on the use of mitigating evidence, the prosecution is free to comment on the weight the jury should accord to it. *See Fox v. Ward*, 200 F.3d 1286, 1299 (10th Cir. 2000). Mr. Bland does not contest the propriety of the mitigating evidence instruction, which provided, in pertinent part, that "[t]he determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case." O.R. Vol. III, at 401. The prosecutors, while critical of Mr. Bland's mitigating evidence, never told the jury it could not consider Mr. Bland's mitigating evidence. The challenged prosecutorial argument was consistent with the jury instructions and bore only on the weight of the evidence.

Nor was it misconduct for the prosecution to suggest that some mitigating evidence helped to establish that Mr. Bland would pose a continuing threat to society. Evidence can be both mitigating and aggravating, and the prosecution is free to explain to the jury how mitigating evidence tends to prove the existence of an aggravating factor. *See Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), *overruled on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Mann v. Scott*, 41 F.3d 968, 979-80 (5th Cir. 1994). The prosecutor's remarks on Mr. Bland's mitigating evidence therefore did not constitute misconduct that deprived Mr. Bland of a fair trial.

*4. Appeal to Civic and Moral Duty*

Mr. Bland next challenges the prosecutor's argument about the jury's civic duty. He claims that in the guilt phase, the prosecutor argued in closing that the jury had a civic duty to convict Mr. Bland. Our review of the record, and especially the portion of the transcript to which Mr. Bland refers, does not indicate any such argument in the first phase of trial. However, in the second phase, the prosecutor argued:

> If you give him anything other than the death penalty you don't know what will happen to him or what opportunities he will get to hurt other people. You have one sentence option available to you that you will know, you've got one option and one option only that guarantees that he's not going to hurt anybody else or kill anybody else. You, the Jury, have the final say. You're the people on whether [sic] this unsuspecting world is kept safe from Jimmy Dale Bland. . . . We talked earlier about citizenship in our great country and how sometimes it comes with a price. There are times it's part of our civic and moral duties of citizenship that we're called upon to face unpleasantly, unpleasant and difficult tasks. You're [sic] got one of those tasks facing you today.

Tr. Jury Trial, Day Seven, at 164; *see also id.* at 198-99. As we have stated numerous times, "[i]t is improper for a prosecutor to suggest that a jury has a civic duty to convict." *Thornburg v. Mullin*, 422 F.3d 1113, 1134 (10th Cir. 2005); *see also Malicoat v. Mullin*, 426 F.3d 1241, 1256 (10th Cir. 2005); *Spears v. Mullin*, 343 F.3d 1215, 1247 (10th Cir. 2003); *Le*, 311 F.3d at 1022 (explaining that such comments are "'offensive to the dignity and good order with which all proceedings in court should be conducted'" (quoting *Viereck v. United States*, 318

U.S. 236, 248 (1943))).  That is not what the prosecutor did in this case.  The

civic duty to which the prosecutor referred was not the duty to convict, or to

return a death sentence, but rather the duty to decide *whether* to sentence Mr.

Bland to death.  While the prosecutor's argument may have come close to the

line, we do not believe he crossed it.

   5. *Sympathy for the Victim*

Mr. Bland argues that the prosecution's closing arguments improperly

evoked sympathy for the victim, Mr. Rains, and that the prosecution improperly

contrasted Mr. Rains's death with Mr. Bland's life in prison.  As to the more

general appeals for sympathy, Mr. Bland points to one comment at each phase of

the trial.  During the first phase, the prosecution said:

> Ladies and gentlemen, on November the 14th, 1996, Jimmy Bland
> wrote the ending to the story of Windle Rains' life.  And today you
> have the chance to write the end of the story of Windle's death.
> Does Windle's murderer go free?  Does he get off with a lesser
> charge because no one's here to speak for Windle as to what
> happened?  You have the power to decide how the story of Windle's
> life and death will end.

Tr. Jury Trial, Day Six, at 133.  At the sentencing phase, the prosecution

"recommend[ed] for the murder of Windle Rains that [the jury] sentence this

Defendant to death by lethal injection" because Mr. Bland would be "getting no

more or less than he deserves for what he did to Windle."  Tr. Jury Trial, Day

Seven, at 201.  We cannot say that these statements were intended to evoke

sympathy for the victim, as they were statements based on the jury's obligation to consider the evidence and render a verdict.

The prosecution's comparison of Mr. Bland's life in prison with Mr. Rains's death, however, was inappropriate. We regret to observe that in death-penalty case after death-penalty case, Oklahoma prosecutors have made speeches to the jury making light of the penalty of life in prison to demonstrate that the only proper punishment for a defendant's crime was death. In this case, the terminology of choice was:

> Maybe the Defendant will be in prison, maybe he will be behind that concrete and those jail bars with his T.V. and his cable and good food. But one thing . . . is for sure, Windle Rains won't be here and his family won't be able to be with him, they won't be able to share holidays with him. And Doyle Rains won't get that final visit with him that he hoped for.

*Id.* at 200. As we have said many times, it is prosecutorial misconduct for the prosecution to compare the plight of the victim with the life of the defendant in prison. *See, e.g.*, *Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002); *Le*, 311 F.3d at 1015-16. "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion," *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (plurality opinion), and comparisons such as those made here call into question the integrity of the criminal justice system.

Although we emphatically do not condone the prosecution's remarks, we must uphold the sentencing determination if we cannot conclude that the comments deprived Mr. Bland of a fundamentally fair trial. *Le*, 311 F.3d at 1016. There was substantial evidence demonstrating the existence of both aggravating factors and relatively little evidence establishing mitigating circumstances. Prosecutors should be aware that arguments of this sort, while unnecessary to obtain a proper verdict, create grave risk of upsetting an otherwise unobjectionable verdict on appeal or on collateral review. It is time to stop. Unable to conclude that the comments affected the outcome of the trial, however, we find that the OCCA's judgment finding the error harmless was not an unreasonable application of clearly established federal law.

### 6. *Arguing Facts not in Evidence*

Finally, Mr. Bland claims that the prosecution argued facts not in evidence during both phases of trial. During the guilt phase, the prosecution argued that a pair of eyeglasses at the scene of the crime belonged to Mr. Rains. Tr. Jury Trial, Day Six, at 22. We perceive no error. Although no direct testimony established that the eyeglasses belonged to Mr. Rains, his ownership of the eyeglasses was a permissible inference to draw from the evidence. As this Court has held, "[a] prosecutor may comment on and draw reasonable inferences from evidence presented at trial." *Thornburg*, 422 F.3d at 1131. The photograph of the crime scene depicted eyeglasses lying near the creek where Mr. Bland disposed of Mr.

-52-

Rains's body, and Sheriff Hanes testified that the glasses were found "just a little ways from the pile of wood" in which Mr. Rains's body was found. Tr. Jury Trial, Day Three, at 87, Ex. 2B. Considering the proximity of the eyeglasses to Mr. Rains's body, it was not unreasonable for the OCCA to conclude that the evidence permitted a reasonable inference that the glasses belonged to the victim.

Even if the prosecution's argument about the eyeglasses were not a reasonable inference from the evidence, this misstatement did not deprive Mr. Bland of a fair trial. The presence of the glasses did not necessarily discredit Mr. Bland's story that he and Mr. Rains struggled. It was entirely possible for the jury to believe that Mr. Bland and Mr. Rains struggled, but that Mr. Rains's glasses did not fall off until Mr. Bland took Mr. Rains's body to the creek. Such a theory is consistent both with the evidence and with Mr. Bland's testimony. Thus, even if the prosecution erroneously attributed the glasses to Mr. Rains, the error did not render the trial fundamentally unfair.

At the sentencing phase, the prosecution argued that Mr. Bland killed Mr. Rains during a robbery. Tr. Jury Trial, Day Seven, at 155. Mr. Bland contends that this line of argument was impermissible, as the jury did not reach a verdict as to felony murder. Because the jury did not convict Mr. Bland on the felony-murder charge, which was predicated on the theory that Mr. Bland killed Mr. Rains in the course of a robbery, it was inappropriate for the prosecution to argue during the sentencing phase that Mr. Bland killed Mr. Rains during a robbery.

However, the error did not render Mr. Bland's sentencing fundamentally unfair because the nature of the murder (felony murder or malice-aforethought murder) did not affect his eligibility for the death penalty, and whether Mr. Bland robbed Mr. Rains during or after the murder did not affect either the aggravating factors or mitigating circumstances.

*7. Cumulative Error*

We now address whether the above errors, considered cumulatively, deprived Mr. Bland of a fair trial at either the guilt or sentencing phase. "A cumulative error analysis aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Thornburg*, 422 F.3d at 1137 (internal quotation marks omitted). In death-penalty cases, we review whether the "improper comments as a whole so infected the trial with unfairness as to make the resulting conviction a denial of due process, or rendered the sentencing fundamentally unfair in light of the heightened degree of reliability demanded in a capital case." *Id.* (internal citation and quotation marks omitted). Because the OCCA concluded that the cumulative errors did not deprive Mr. Bland of a fair trial, we must defer to its ruling unless it constitutes an unreasonable application of the cumulative-error doctrine.

Three errors affected the guilt phase of the trial: (1) argument that the jury should consider manslaughter only after it rejected first-degree murder; (2) a

comment on Mr. Bland's post-*Miranda* silence; and (3) ridiculing Mr. Bland as a "sniffling . . . coward[]." The evidence establishing Mr. Bland's guilt on the first-degree malice-aforethought murder charge was quite strong. Mr. Bland had previously told Ms. Lord that he wanted to kill Mr. Bland. He admitted to hiding his shotgun in his coveralls so Mr. Rains would not see the weapon, and to shooting Mr. Rains in the back of the head. He attempted to cover up the murder by cleaning the garage and discarding Mr. Rains' body in a remote creek and covering the body with logs. He then lied to his mother so that she would not know that anything had happened to Mr. Rains. Excluding all impermissible prosecutorial comments and considering any curative instructions, it was not unreasonable for the OCCA to conclude that the jury had substantial evidence to convict Mr. Bland of first-degree murder, and that the errors did not result in a denial of due process.

There were two instances of prosecutorial misconduct at the sentencing phase: (1) ridiculing Mr. Bland as a "violent and evil man," and a "heartless and vicious killer"; and (2) comparing Mr. Bland's life in prison to Mr. Rains's death. For reasons already explained, however, the evidence supporting both aggravating factors was overwhelming and the mitigating evidence weak. Having reviewed the entire record, we conclude that the OCCA reasonably applied clearly established federal law in determining that the sentence was not the consequence of any prosecutorial misconduct.

-55-

### G. *Ineffective Assistance of Counsel*

Last, Mr. Bland has raised three grounds for ineffective assistance of trial counsel: (1) failing to request an instruction on voluntary intoxication; (2) failing to adequately investigate, prepare, and use available evidence during both stages of trial; and (3) failing to lodge appropriate objections for the claims discussed above. Mr. Bland also requests an evidentiary hearing to further develop his claims of ineffective assistance of counsel.

Mr. Bland raised all of these claims on direct appeal. Applying the standard of *Strickland v. Washington*, 466 U.S. 668 (1984), the OCCA rejected his voluntary-intoxication-instruction claim, finding that Mr. Bland was not prejudiced by counsel's failure to request the instruction because the instruction was not supported by the evidence. *Bland*, 4 P.3d at 731. The OCCA deemed Mr. Bland's failure-to-investigate claim waived because the arguments relied on affidavits that were not part of the appellate record. *Id.* Nonetheless, the OCCA considered the claim in light of Mr. Bland's request for an evidentiary hearing. *Id.* at 732. Examining the affidavits that would be proferred at such a hearing, the court rejected the claims. *Id.* at 732-34. The OCCA also rejected Mr. Bland's claim arising from counsel's failure to object to prosecutorial misconduct, finding no reasonable probability that the result of the trial would have been different had counsel objected. *Id.* at 732. The district court likewise rejected Mr. Bland's claims, "confident that the jury would have convicted Petitioner of first-degree

murder and recommended a death sentence even if trial counsel had employed all of the trial tactics and had used all of the information that Petitioner's current counsel suggests he should have." R. Doc. 61, at 26.

Claims of ineffective assistance of counsel present mixed questions of law and fact. *Wallace v. Ward*, 191 F.3d 1235, 1247 (10th Cir. 1999). To prevail on such a claim, a petitioner "must prove [1] that counsel's performance was constitutionally deficient and [2] that counsel's deficient performance prejudiced the defense, depriving the petitioner of a fair trial with a reliable result." *Boyd v. Ward*, 179 F.3d 904, 913 (10th Cir. 1999) (citing *Strickland*, 466 U.S. at 687). It is not enough that counsel's decisions were wrong in hindsight; they must fall below "an objective standard of reasonableness," evaluated from counsel's perspective at the time the decision was made. *Strickland*, 466 U.S. at 689. For that reason, we are "highly deferential" to counsel's decisions, and a petitioner "must overcome the presumption that counsel's conduct was not constitutionally defective." *Wallace*, 191 F.3d at 1247.

We need not consider whether counsel's performance was deficient, however, if the petitioner was not prejudiced by the alleged deficiency. *See Allen v. Mullin*, 368 F.3d 1220, 1245 (10th Cir. 2004) (proceeding directly to prejudice analysis). To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. For

challenges to counsel's conduct during the sentencing phase, a petitioner must show "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695.

### *1. Failure to Request a Voluntary Intoxication Instruction*

In considering this claim of ineffective assistance, the OCCA found that Mr. Bland would not have been entitled to such an instruction and therefore was not prejudiced. *Bland*, 4 P.3d at 731. Oklahoma law provides for an instruction on voluntary intoxication only when a defendant presents sufficient *prima facie* evidence that he meets the legal criteria for the defense of voluntary intoxication. *Jackson v. State*, 964 P.2d 875, 892 (Okla. Crim. App. 1998). To satisfy the legal criteria, a defendant must actually be intoxicated and "be so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent or special mental element of the crime." *Id.* The OCCA has held that it belies a defense of voluntary intoxication for a defendant to have been sufficiently aware so as to be able to testify about events surrounding a murder. *See id.*

The OCCA's decision that Mr. Bland was not entitled to a voluntary intoxication instruction was not unreasonable. Although Ms. Lord and Mr. Bland both testified that he consumed drugs before the murder, Mr. Bland's ability to recall, in detail, the events surrounding the murder—his argument with Mr. Rains,

placing the gun in his coveralls, kicking Mr. Rains, cleaning the garage, and hiding Mr. Rains's body—defeats his voluntary intoxication defense under Oklahoma law. Counsel therefore could not have been ineffective in failing to request an instruction to which Mr. Bland was not entitled based on the evidence, and the OCCA therefore did not unreasonably apply clearly established federal law.

*2. Failure to Investigate, Prepare, and Use Available Evidence*

Although the OCCA found this claim waived due to lack of evidentiary support, it considered the claim based on the evidence that Mr. Bland would provide at an evidentiary hearing. For simplicity, we will consider the claims in light of the evidence that Mr. Bland would present if we were to order an evidentiary hearing. Mr. Bland challenges three specific items that trial counsel allegedly failed to investigate: his own intoxication, Ms. Lord's credibility, and the circumstances of his prior conviction. He also contends that counsel failed to properly use evidence available from Dr. Church to emphasize the extent of Mr. Bland's mental and substance-abuse problems.

As to the level of his intoxication, Mr. Bland presents affidavits from four different people who refer to his drug use immediately before and after the murder. *Bland*, 4 P.3d at 733. The OCCA found that counsel was not ineffective for failing to present this evidence of intoxication because trial counsel presented substantial evidence of Mr. Bland's drug use on the day of the murder and, in any

case, Mr. Bland's detailed recollection of the murder precluded an instruction on voluntary intoxication. *Id.* This conclusion was not an unreasonable application of Supreme Court precedent. As discussed above, Mr. Bland was not entitled to an instruction on voluntary intoxication. He therefore suffered no prejudice by counsel's failure to present additional, redundant evidence supporting Mr. Bland's unrefuted testimony that he consumed drugs immediately before and after the murder.

To challenge Ms. Lord's credibility, Mr. Bland claims that his trial counsel should have asked the custodian of records at the Oklahoma County Jail to testify that Ms. Lord was incarcerated for seventy-five days, beginning on November 19, 1996. *Id.* The OCCA held that counsel's failure to call this witness did not prejudice Mr. Bland because trial counsel sufficiently called Ms. Lord's credibility into question. *Id.* At trial, Ms. Lord herself admitted that she had been incarcerated before trial and was currently incarcerated. Defense counsel also called two witnesses to challenge Ms. Lord's truthfulness. A child welfare specialist opined that Ms. Lord is not "a truthful person." Tr. Jury Trial, Day Five, at 8. Ms. Lord's sister testified that Ms. Lord has "been untruthful . . . on numerous occasions" and that she cannot "rely on her to tell the truth all the time." *Id.* at 18. In light of the ample evidence trial counsel presented to challenge Ms. Lord's credibility, the OCCA's decision that counsel's failure to

present additional impeachment evidence did not prejudice Mr. Bland and did not involve an unreasonable application of clearly established federal law.

Directing the court to newspaper articles, Mr. Bland next argues that had counsel fully investigated his prior conviction, counsel would have discovered that Mr. Bland fired his gun at pursuing officers only after the officers shot at him. *Bland*, 4 P.3d at 733-34. The OCCA found that counsel was not deficient and that "[a]ny additional evidence counsel might have presented . . . would not have been found sufficiently mitigating by a reasonable juror to outweigh the evidence in aggravation." *Id.* at 734. The evidence introduced at trial concerning Mr. Bland's prior manslaughter conviction indicated that the police fired first and that Mr. Bland had been drinking before the crime. Considering that the jury was informed that the police fired first, it was not unreasonable for the OCCA to conclude that counsel's failure to conduct further investigation was not deficient performance.

Nor has Mr. Bland established that counsel was deficient for failing to question Dr. Church in such a way as to reveal the full extent of Mr. Bland's mental and substance-abuse problems. *See id.* at 732. Dr. Church's testimony was well developed. She testified that Mr. Bland had "low average intelligence" and "difficulty . . . understanding just the usual social standards of society" and "making judgments about what is appropriate and what is not appropriate." Tr. Jury Trial, Day Seven, at 117. She explained that his long history of abusing

-61-

substances makes him a "chemically dependent person," meaning that he would have even less abilities to operate under stress if he were using drugs. *Id.* at 122. She talked about the childhood trauma he endured when his father suffered a brain injury, and testified that this likely manifested itself in post-traumatic stress disorder. *Id.* at 122-24. When asked whether he was likely to be a violent prisoner, she emphasized that Mr. Bland "knows right from wrong," and that "he would be a good prisoner" in a "structured, supervised situation." *Id.* at 129-30. Counsel thoroughly explored Mr. Bland's background, mental status, and chemical dependency with Dr. Church. The OCCA's finding that counsel was not deficient therefore did not involve an unreasonable application of clearly established federal law.

### 3. *Failure to Object*

Mr. Bland also claims that counsel was ineffective by failing to object to the prosecutorial misconduct and other sources of error discussed above. The OCCA rejected this claim, finding that timely objections would not have affected the outcome of the trial. *Bland*, 4 P.3d at 732. Some of the alleged prosecutorial misconduct did not constitute error for which an objection would have been sustained. This is true of the purported *Caldwell* violation, the prosecution's characterization of Mr. Bland as a liar, and the allegations that the prosecution demeaned his mitigating evidence, told the jury it had a moral and civic duty to convict, evoked sympathy for the victim, and argued facts not in evidence.

-62-

Counsel in fact lodged objections to various improper statements, including the prosecution's only comment on Mr. Bland's post-arrest, post-*Miranda* silence, Tr. Jury Trial, Day Six, at 96; *Bland*, 4 P.3d at 730 (noting that the trial court sustained the objection), the prosecution's comparison of Mr. Bland's life in prison with Mr. Rains's death, Tr. Jury Trial, Day Seven, at 200, and the prosecution's argument ridiculing Mr. Bland as a coward, Tr. Jury Trial, Day Six, at 38.  Because Mr. Bland did not suffer prejudice from the remaining errors, namely the prosecutor's inaccurate characterization of the jury instructions and calling Mr. Bland an "evil man" and a "heartless and vicious killer," the OCCA's decision that Mr. Bland was not prejudiced by counsel's failure to object was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

### 4.  *Request for Evidentiary Hearing*

Under AEDPA, a court cannot hold an evidentiary hearing unless (1) the claim relies on a new rule of constitutional law or a factual predicate that could not have been previously discovered, and (2) the facts underlying the claim are sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable jury would have found the petitioner guilty.  28 U.S.C. § 2254(e)(2).  However, the pre-AEDPA standard applies when "a habeas petitioner has diligently sought to develop the factual basis underlying his habeas petition, but a state court has prevented him from doing so."  *Miller v. Champion*,

161 F.3d 1249, 1253 (10th Cir. 1998). By seeking an evidentiary hearing in state court, Mr. Bland diligently sought to develop the factual basis of his habeas petition. We therefore apply pre-AEDPA standards, which entitle him to an evidentiary hearing if "his allegations, if true and if not contravened by the existing factual record, would entitle him to habeas relief." *Id.* Having considered the evidence Mr. Bland would introduce at an evidentiary hearing to support his claims of ineffective assistance of counsel and having found no meritorious ineffective-assistance-of-counsel claim, we find that he has not established an entitlement to habeas relief. To the contrary, our review of the record indicates that Mr. Bland's trial counsel were diligent and thorough in their representation and we commend them for their work in this case. The district court therefore did not err in denying his request for an evidentiary hearing.

## IV. Conclusion

For the reasons set forth above, we **AFFIRM** the district court's decision denying Mr. Bland's 28 U.S.C. § 2254 petition for a writ of habeas corpus.