FILED
United States Court of Appeals
Tenth Circuit

February 12, 2010

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JOHN DAVID DUTY,

      Petitioner - Appellant.

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

      Respondent - Appellee.

No. 07-7073
(E.D. Okla.)
(D.C. No. 6:05-CV-23-FHS-SPS)

**ORDER AND JUDGEMENT**[*]

Before **MURPHY**, **HARTZ**, and **O'BRIEN**, Circuit Judges.

John David Duty, an Oklahoma state prisoner, was sentenced to death after he

pled guilty (against the advice of counsel) to the 2001 murder of his cellmate, Curtis

Wise. He waived the presentation of mitigating evidence at sentencing, again against the

advice of counsel. As later explained, Duty intends to continue his murderous ways.

Nevertheless, he appeals from the district court's denial of his 28 U.S.C. § 2254 habeas

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th
Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1.
It is appropriate as it relates to law of the case, issue preclusion and claim preclusion.
Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A).
Citation to an order and judgment must be accompanied by an appropriate parenthetical
notation – (unpublished). *Id.*

petition.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I.      BACKGROUND

A.      Initial Proceedings

Duty was imprisoned in August 1978 after being convicted of armed robbery, kidnapping, first degree rape and shooting with intent to kill.  In December 2001, the 49-year-old Duty was placed on the disciplinary "H-unit" after being found with contraband. On December 13, 2001, prison officials placed twenty-two-year-old Wise in the same cell with Duty.  On the evening of December 19, Wise allowed Duty to bind him from behind to fake an altercation so Duty would be moved to administrative segregation.  While Wise was bound, Duty strangled him to death with a bed sheet.

Approximately one hour later, Duty wrote a letter to Wise's mother which stated:

Mary Wise,

Well by the time you get this letter you will already know that your son is dead.  I know now because I just killed him an hour ago.  Gee you'd think I'd be feeling some remorse but I'm not.   I've been planning since the day he moved in last Friday.  Tonight I finally pulled it off.  Would you like to know how I did it?  Well I told him I wanted to use him as a hostage.  Hell he went right for it, thinking he was gonna get some smokes out of the deal. Well I tied him up hands and feet, then I strangled him.  It's not like the movies, it took awhile.  But I really did him a favor as he was to [sic] stupid to live.  I mean he didn't know me 5 days and he let me tie him up like that, Please!  Besides he was young and dumb and would've just been in and out of prison his whole life.  So I saved him all the torment.  I've been in 24 years, wish someone would have done me the same favor back then.

I guess you're thinking I'll be punished for this.  Well not likely in this county.  The DA's here are weak bitches and don't give a damn about deaths of inmates.  We're all just scum to them.  Besides I'm doing 2 life sentences so they can't hurt me.  But you can call them and tell them about this letter, but it wouldn't do you any good.  Well I'm gonna close for now and I'll tell police in the morning about Curtis.

(R. Vol. 6, Ex. 1.) The letter was confiscated before it left the prison.[1]

At some point after the murder, Duty wrote a letter to the district attorney inquiring "whether you intend to file murder charges against me or not." (R. Vol. 1, Doc. 21, Ex. A.) Duty stated:

> Now I have a proposition for you. I'm willing to come over there right now and plead guilty to a Murder 1 charge. But that's only if you do it immediately. After that you can just spend the money for a jury trial. But here's my deal. I do it only for a death sentence. I'm never getting out of here with the time I'm doing. And with all my bad behavior in here I'm never going to make parole. So there's no time you can give me that would harm me in the least way. And because of my violent record you can't say I don't deserve the death penalty. I've killed another inmate, taken hostages 3 times, and assaulted a guard. Plus other various things to[o] numerous to mention. You may think me crazy for this, and yes I'm [sic] guess I am a bit crazy or I'd not have done [the] things I've done. But I'm totally sane and know what I'm doing, and am prepared to face my punishment which I rightfully deserve. Now if you don't do this you're only telling me it's ok for me to kill again [and] again because you're not gonna do anything to me. And if that's what it takes to get you to do something then I'll be more than happy to do it. Only next time it will be a guard or staff member, as I know you'll prosecute me then . . . .

> So the ball is in your corner, are you going to do your job or do you allow me to continue on doing mine.

(*Id.*)

Duty was charged with first degree murder. The State sought the death penalty and filed a bill of particulars listing four aggravating factors: (1) Duty was previously convicted of prior violent felonies; (2) the murder was especially heinous, atrocious and cruel; (3) Duty was a continuing threat to society; and (4) the murder occurred while

---

[1] Investigator Tim Coppick interviewed Duty the morning after the murder. Duty told the investigator he wrote the letter and mailed it. The investigator alerted the warden and the letter was intercepted before it left the prison.

Duty was incarcerated.

At his arraignment, Duty's counsel informed the court Duty wished to plead guilty to both the charge and the bill of particulars, against counsel's advice. The court ordered Duty's competency be evaluated prior to entering a plea. *See Fluke v. State,* 14 P.3d 565, 567 (Okla. Crim. App. 2000) (an independent competency evaluation shall be conducted in all death penalty volunteer cases). Duty underwent two competency evaluations.[2] The court admitted the reports of Dr. Kenneth Williams, Dr. Jeanne Russell and Dr. Paul Lanier by stipulation at the post-competency evaluation hearing held on October 28, 2002.

All three professionals found Duty competent to enter a plea.[3] Duty testified on his own behalf. He described his evaluations, stating Dr. Williams conducted "a short question and answer; wasn't much to it, about ten minutes." (R. Vol. 6 at 8.) Doctors Russell and Lanier "went through a two-hour question[ing]" and gave him several "mental test[s]." (*Id.* at 9.) Duty testified he was competent at the time of the hearing.

The court then asked questions, explaining to Duty the importance of his answers. When asked why he wanted the death penalty, Duty replied: "Well, number one, I know I am never getting out of prison; I am going to spend the rest of my life there . . . . I feel

---

[2] Duty was examined by Dr. Kenneth Williams on August 16, 2002. Defense counsel filed a motion for further evaluation which was granted. Doctors Jeanne Russell and Paul Lanier evaluated Duty on October 4, 2002.

[3] A defendant who has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and has a rational as well as factual understanding of the proceedings against him" is competent to plead guilty. *Godinez v. Moran*, 509 U.S. 389, 396, 398-99 (1993) (quotations omitted).

that if I stay in prison, I am just going to continue doing the same things I have done in the past . . . . [I]f I get angry at someone, I'm going to do something." (*Id.* at 12-13.) The court's continued questioning clarified Duty meant he would kill someone. Duty asked the court to abide by his wishes for a death sentence because it was what he wanted, he deserved it, and "if [he] went to a jury trial, [he'd] probably get the same thing." (*Id.* at 14.)

The district court declared Duty competent, took a brief recess, then continued with arraignment and sentencing. After a thorough colloquy, Duty pled guilty to premeditated murder. The court proceeded to the bill of particulars with respect to the death penalty factors, receiving Duty's assurances he understood he had the right to a separate trial on these allegations and could call witnesses to present mitigating evidence. Duty stated he had discussed all these matters with counsel and specifically waived his right to present mitigation evidence. Duty pled guilty to each charge in the bill of particulars and again stated he did not want any other evidence considered prior to sentencing. The court accepted Duty's plea.

The court asked defense counsel if he had spoken with Duty about his decision to forego presentation of mitigating evidence. Counsel responded:

> Yes, Your Honor. Yes, I have . . . . [W]e have talked about it at length, the second stage of trial and what that is, what mitigation is.
>
> As a matter of fact, in spite of what Mr. Duty had indicated was his desire, we have still investigated the case with regard to his background in preparation for mitigation, should Mr. Duty change his mind.
>
> And so we do have evidence which I have talked to Mr. Duty about that we could present; however, again against counsel's advice, it is his desire to

- 5 -

waive that right to mitigation.

(*Id.* at 48-49.)  Duty confirmed his counsel's statement.

The State called two witnesses, the mother of the victim, Mary Wise, and Dr.

Williams.  Ms. Wise begged the judge to sentence Duty to life without parole, stating:

> I don't believe he ought to have a choice.  I think he ought to sit in that cell
> and face those four walls and think about what he did for the rest of his
> natural-born life.

> And I hope and pray to God that you live to be 110 years old, because
> that's how long I want you to think about what you did.

(*Id.* at 52.)  Dr. Williams testified Duty "emphatic[ally]" told him he intended to continue

killing if he remained in prison.  (*Id.* at 56.)  After the State presented its evidence, the

court again received assurances from Duty that he did not want to present evidence.  His

counsel waived closing argument.

The district court recognized the sincerity of Ms. Wise's wishes, but nonetheless

sentenced Duty to death.  The court explained Duty's felony record and his intent to kill

again made the case a "textbook case for the death penalty."  (*Id.* at 66.)

B.    Direct Appeal

Because Duty did not move to withdraw his plea, his direct appeal to the

Oklahoma Court of Criminal Appeals (OCCA) was limited to its mandatory sentence

review.[4]  *See Duty v. State*, 89 P.3d 1158, 1160 (Okla. Crim. App. 2004).  The OCCA

---

[4] Although Duty initially waived his right to appeal, he later requested the district court to appoint post-conviction relief counsel and the court granted that request. Therefore, "[t]o ensure that Mr. Dut[y's] rights are protected," appellate counsel (who was also trial counsel) filed a brief raising "legal propositions that [went] beyond the scope of [the OCCA's] statutory mandatory sentence review." (R. Vol. 8, Appellant's Br. on Direct Appeal at 5.)

affirmed Duty's conviction and sentence, finding "there was sufficient evidence from which the trial court could have found the existence of the four aggravating circumstances" and "the death penalty was appropriate in this case; it was not imposed under the influence of passion, prejudice, or any other arbitrary factor." *Id.* at 1162. Duty did not seek a rehearing or appeal to the Supreme Court.

C.       Post-conviction Proceedings

Represented by new counsel, on August 27, 2004, Duty filed an original application for post-conviction relief with the OCCA pursuant to Okla. Stat. Ann. tit. 22, § 1089. He claimed he received ineffective assistance of counsel because counsel did not have sufficient time to investigate and present compelling mitigating evidence and, therefore, the OCCA and trial court were deprived of such evidence. Duty argued that at the time he pled guilty he was depressed and his depression probably contributed to the murder as well as to his decision to plead guilty. He maintained that despite his decision to plead guilty and his knowing waiver of his right to present mitigating evidence at sentencing, trial counsel's failure to "uncover the story of [his] life" prevented the OCCA and trial court from weighing the aggravating and mitigating factors to determine whether the death sentence was appropriate. (R. Vol. 7, Appellant's Application for Post-Conviction Relief at 7.) Duty also claimed two of the charged aggravating circumstances were duplicative because the same evidence was used to prove both.

Duty supplemented his post-conviction relief application with a request for an evidentiary hearing. In support of his motion for an evidentiary hearing, Duty presented the following evidence: (1) the affidavit of his trial counsel; (2) the affidavit of Dorothy

Walos, an investigator with the Oklahoma Indigent Defense System; (3) a report by Dr. Gilbert Sanders, a licensed psychologist; and (4) specific prison records. Duty's trial counsel averred his trial preparation included an investigation into potential mitigation evidence but "[i]f we would have had more time than the three months we had . . . we would have, no doubt, uncovered a great deal more potential mitigating evidence." (R. Vol. 7, Application for Post-Conviction Relief, Ex. 1.) Walos, assigned to investigate Duty's background for post-conviction relief purposes, contradicted counsel's statement. She stated: "It became apparent in reviewing the records of John Duty that virtually no investigation had been conducted" but "[a]s the investigation unfolded it appeared John Duty's life was full of mitigating circumstances considered significant in death penalty cases." (*Id.,* Ex. 8 at 1.) The evidence included documented "head injuries, abuse and mental illness." (*Id.*)

Dr. Gilbert Sanders, a licensed psychologist, evaluated Duty at the request of Duty's post-conviction counsel and submitted a report on August 18, 2004. He opined Duty suffered at least two significant head traumas, one at the age of ten and another when he was seventeen. Neither injury was followed by significant neurological assessment or intervention. Due to the absence of data, Dr. Sanders was unable to determine if any of Duty's cognitive functioning problems were the result of these injuries. Duty's cognitive problems included a "lack of speed in recognizing and processing visual information" and "serious problems [in] the areas of Language, Emotion and Affect Processing." (R. Vol. 7, Application for Post-Conviction Relief, Ex. 2 at 3.) The interview and psychological testing revealed Duty "was psychologically

depressed and may have a somatoform disorder."[5]  (*Id.* at 1.)  Dr. Sanders said

"[a]ttention is warranted given the current diagnosed depression and reoccurring suicidal

thoughts" and recommended "immediate psychological and medical intervention."  (*Id.* at

3.)

Prison records were apparently submitted to demonstrate Duty's increased

depression.  The records show, in the months prior to Wise's murder, Duty was

recommended for several prison jobs but the recommendations were denied.

The OCCA denied the application for post-conviction relief in an unpublished

opinion.  *Duty v. State*, No. PCD-2003-823 (Okla. Crim. App. Oct. 11, 2004).  Relevant

here, the OCCA determined counsel was not ineffective and, even if he were, Duty was

not prejudiced by counsel's failure to discover the mitigation evidence presented in his

post-conviction application.

D.      Federal Habeas Proceedings

On January 13, 2005, Duty initiated this federal habeas action by filing with the

district court a *pro se* motion to proceed *in forma pauperis* and a motion for appointment

of counsel.  The court granted both motions.  However, on April 4, 2005, after counsel

was appointed, Duty wrote a *pro se* letter to the district court saying he "want[ed] to stop

[his] appeals."  (R. Vol. 1, Doc. 16.)  On April 25, 2005, the court conducted a hearing

regarding Duty's letter.  The court continued the matter and ordered Duty to undergo

---

[5] A somatoform disorder "is any of a group of psychological disorders (as body
dysmorphic disorder or hypochondriasis) marked by physical complaints for which no
organic or physiological explanation is found and for which there is a strong likelihood
that psychological factors are involved."  *See*
http://www.nlm.nih.gov/medlineplus/mplusdictionary.html

another competency evaluation. The competency report was filed under seal on July 7, 2005.

Duty's appointed counsel filed a petition for writ of habeas corpus on July 28, 2005, raising six issues for the court's consideration: (1) his trial counsel failed to investigate and present mitigating evidence; (2) two aggravating circumstances were duplicative in violation of the Eighth Amendment; (3) the "continuing threat" aggravator is unconstitutional; (4) the "heinous, atrocious, or cruel" aggravator is unconstitutionally vague with no evidence to support its finding; (5) Duty's prior violent felonies were too remote in time to be used as aggravating factors; and (6) Oklahoma's death sentence protocol violated the Eighth and Fourteenth Amendments.

On August 1, 2005, the hearing regarding Duty's "stop the appeal" letter was reconvened. Duty orally moved to withdraw his letter and continue the proceedings. The court granted his oral motion. However, on January 24, 2007, Duty sent another letter to the court asking to stop the proceedings. Four days later, Duty wrote to rescind the request, stating he "was frustrated with [the] lack of medical attention and the hopelessness [prison] leaves you feeling" but had spoken with counsel and wished to proceed. (R. Vol. 1, Doc. 45.)

On August 17, 2007, the district court issued an order denying Duty's habeas petition. Relevant here, it held the OCCA correctly determined the performance of Duty's counsel, even if ineffective, did not prejudice Duty. The court also determined the constitutional challenge to Oklahoma's death penalty protocol was procedurally barred and otherwise without merit. It subsequently granted a certificate of appealability

(COA) with respect to these two issues. Duty does not seek to expand the issues on appeal.

## II. DISCUSSION

A. Standard of Review

We review Duty's appeal from the denial of his habeas petition under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Snow v. Sirmons*, 474 F.3d 693, 696 (10th Cir. 2007). Under the AEDPA, a petitioner is not entitled to federal habeas relief on a claim addressed on the merits by the state courts unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). When reviewing a state court's application of federal law under § 2254(d)(1), "[a] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied the law incorrectly. Relief is available . . . only if the state court's decision is objectively unreasonable." *Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (quotations and citation omitted). Determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, -- S. Ct. --, No. 08-9516, 2010 WL

173369, at \*6 (Jan. 20, 2010).

B.      Ineffective Assistance of Counsel

        1.      Clearly established federal law

The Supreme Court's decision in *Strickland v. Washington* is the "clearly established Federal law" governing this claim.  466 U.S. 668 (1984).  There, the Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

The OCCA rejected Duty's petition for post-conviction relief on both prongs of *Strickland.  Duty v. State*, No. PCD-2003-823 at 9.  The district court denied habeas relief, concluding Duty "has failed to establish prejudice under *Strickland* and, therefore, his claim of ineffective assistance of counsel has no merit." *Duty v. Sirmons*, No. CIV-05-23-FHS-SPS, 2007 WL 2358648, at \*10 (E.D. Okla. 2007).

The OCCA saw no deficiency in counsel's performance and found Duty suffered no prejudice even if counsel's performance had been deficient.  Duty's appeal brief focuses almost exclusively on the first prong of the *Strickland* test—trial counsel's

- 12 -

allegedly deficient performance.[6] We need not consider whether counsel's performance was deficient, however, if Duty was not prejudiced by the alleged deficiency. *Strickland*, 466 U.S. at 697. In this case, even if the facts Duty alleges his counsel might have discovered were available and credible, he has not met the second prong of *Strickland's* ineffectiveness test. He has failed to show prejudice. We therefore proceed directly to our analysis of *Strickland's* prejudice prong.

2. Prejudice

To show he was prejudiced by counsel's allegedly deficient performance at sentencing, Duty must demonstrate "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Duty's prejudice argument is notably weak. He maintains he was prejudiced because his "counsel did nothing to prevent [him] . . . from waiving mitigation and requesting death" and "a full investigation would have revealed valuable mitigation evidence." (Appellant's Reply Br.

---

[6] Duty relies almost exclusively on the standards set forth in the 2003 ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines). The ABA Guidelines are useful as "guides" in determining whether counsel's performance was reasonable. *See Strickland*, 466 U.S. at 688. "[B]ut only to the extent they describe the professional norms prevailing *when the representation took place*." *Bobby v. Vanhook*, -- U.S. --, 130 S. Ct. 13, 16 (2009) (rejecting appellate court's reliance on ABA guidelines announced eighteen years after defendant went to trial) (emphasis added). The 2003 ABA Guidelines were approved on February 10, 2003, over three months after the challenged representation. Moreover, to the extent Duty argues a failure to comply with the ABA Guidelines will, in every instance, result in ineffective assistance, he is wrong. The ABA Guidelines "are only guides to what reasonableness means, not its definition." *Id.* at 17 (quotations omitted) (rejecting appellate court's treatment of ABA Guidelines as "inexorable commands with which all capital defense counsel must fully comply" rather than as mere "evidence of what reasonably diligent attorneys would do") (quotations omitted).

at 7-8.) Notwithstanding Duty's "counsel should have saved me from myself" argument, he has failed to demonstrate a reasonable probability that the trial judge would have sentenced him to something less than death, even if he had considered all of the claimed mitigation evidence.

The State contends the Supreme Court's decision in *Schriro v. Landrigan*, 550 U.S. 465 (2007), is controlling. There, the Court considered whether a defendant who instructed his counsel not to present mitigating evidence could claim prejudice if his counsel conceded to his wishes and did not further investigate. In *Schriro*, Landrigan refused to allow his counsel to present the testimony of his ex-wife and birth mother as mitigating evidence at his sentencing hearing. *Id.* at 469. He also repeatedly interrupted when counsel tried to proffer mitigating evidence and told the court he did not wish to present any mitigating evidence. *Id.* at 469-70. At the conclusion of the sentencing hearing, when asked whether he wished to make a statement, Landrigan said: "I think if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.* at 470 (quotations omitted). After being sentenced to death, Landrigan filed a state post-conviction proceeding, arguing counsel was ineffective for failing to investigate mitigating evidence. *Id.* at 471. The state court denied relief because he had instructed counsel not to present mitigating evidence at the sentencing hearing. *Id.*

On appeal from the federal district court's denial of Landrigan's federal habeas petition, the Ninth Circuit held he was entitled to an evidentiary hearing "because he raised a 'colorable claim' that his counsel's performance" was constitutionally deficient. *Id.* at 472. Proceeding straight to *Strickland's* second prong, the Supreme Court reversed.

- 14 -

It noted: "Neither *Wiggins*[7] nor *Strickland* addresse[d] a situation in which a client interfere[d] with counsel's efforts to present mitigating evidence to a sentencing court." *Id.* at 478. As a result, "at the time of the Arizona postconviction court's decision, it was not objectively unreasonable for that court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence." *Id.*

Recently, we distinguished *Schriro* from a situation where a defendant declined to present his family's live testimony, but allowed the same evidence to be admitted by stipulation. *See Young v. Sirmons*, 551 F.3d 942, 958-59 (10th Cir. 2008), *cert. denied*, 130 S. Ct. 272 (2009). Relying on *Schriro*, the State argued Young could not demonstrate prejudice resulting from counsel's failure to investigate, develop and present mitigating evidence because it is clear he would not have allowed such evidence to be presented because he demanded the mitigation evidence be limited to the stipulation. *Id.* at 959. We rejected this argument because

> [u]nlike the defendant in *Schriro*, who waived his right to present mitigating evidence, thereafter refused to allow his counsel to present any type of mitigating evidence on his behalf, and all but asked the trial court to sentence him to death, Young simply chose to forego the presentation of testimony from the handful of friends and family members that his trial counsel had lined up to testify. Further, as the OCCA expressly found, "Young did not waive mitigation, but rather opted to introduce it through stipulation."

> . . . .

---

[7] *See Wiggins v. Smith*, 539 U.S. 510, 533-34 (2003) (concluding counsel's incomplete investigation of mitigating evidence prior to defendant's capital sentencing proceedings constituted deficient performance).

> Thus, we conclude that Young's decision to forego live mitigation witnesses and rely on the written stipulation of mitigating evidence does not prevent him, in the context of these federal habeas proceedings, from establishing prejudice under the second prong of the *Strickland* test.

*Id.* Nonetheless, after carefully considering Young's proposed mitigating evidence weighed against the aggravating factors, we concluded "there [was no] reasonable likelihood that the jury would have reached a different . . . outcome." *Id.* at 969.

Duty argues his case is also distinguishable from *Schriro*. First, he claims it was essential for counsel to investigate mitigating evidence which, if discovered and presented to him, might have affected his ability to knowingly waive mitigation evidence. His argument was rejected in *Schriro*, where the Court specifically stated it "ha[d] never imposed an 'informed and knowing' requirement upon a defendant's decision not to introduce evidence." 550 U.S. at 479. Neither has the Court "required a specific colloquy to ensure that a defendant knowingly and intelligently refused to present mitigating evidence." *Id.*

Undaunted, Duty now claims defense counsel's failure to investigate, discover and proffer mitigating evidence (contrary to his direction to defense counsel at the time) also distinguishes this case from *Schriro*. We are most skeptical—the Supreme Court did not suggest such duty. Instead, it discussed the proffered evidence to demonstrate how Landrigan's interference with counsel's presentation established his unquestionable desire to waive mitigation.

Duty maintains another distinction is that he did not actively interfere with counsel. Therefore, the record is devoid of evidence that had he been presented with

- 16 -

"well-developed and clearly available historical and psychological/medical mitigation, [he] would have persevered in his guilty plea to the aggravating factors." (Appellant's Br. at 17-18.) We disagree. Duty's case is indistinguishable from *Schriro*. The Supreme Court ultimately upheld Landrigan's death sentence based on two considerations. First, "the state courts' factual determination that Landrigan would not have allowed counsel to present any mitigating evidence at sentencing [wa]s not an unreasonable determination of the facts under § 2254(d)(2) . . . ." *Id.* at 481. Second, "the mitigating evidence he s[ought] to introduce would not have changed the result." *Id.* Duty's case compels the same result.

The OCCA found that even had Duty known about his depression at the time of sentencing, he would have made the same decision to waive his right to present mitigating evidence. The OCCA based its decision on the facts demonstrating: (1) Duty's "entire plan was to kill someone and ask that the State kill him as punishment"; (2) "Duty chose to stipulate to the aggravating circumstances set forth in the bill of particulars, against his attorney's advice"; and (3) he specifically "stated that he would kill again if he did not receive the death penalty." (R. Vol. 7, Order Denying Original Application for Post-Conviction Relief at 8.) Determinations of factual issues made by state courts are presumed correct and a habeas petitioner must rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood*, 2010 WL 173369, at *6.

The OCCA's factual finding is most probably correct; it is patently reasonable in

- 17 -

any event. Duty was consistent in his actions from the time of the murder and throughout the initial proceedings. He repeatedly assured the court he had discussed the nature of the mitigation proceedings with counsel, yet adamantly insisted on the death penalty. Nothing in Dr. Sanders' report indicates Duty's knowledge of depression prior to pleading guilty would have changed his mind.[8] Put simply, there is no reasonable probability that, "but for counsel's unprofessional errors, the result of the [sentencing] proceeding would have been different." *Strickland*, 466 U.S. at 694.

In our prejudice review, we look to whether the OCCA independently reweighed the evidence in aggravation against the *totality* of all the then available mitigating evidence (that produced to the trial judge (which was none) and that produced to the OCCA in post-conviction proceedings) and reasonably "concluded that the balance of aggravating and mitigating circumstances . . . warrant[ed] death." *Id*. at 695. Given the evidence, we need not belabor this point unnecessarily. Duty's mitigation argument relies primarily on the report of Dr. Sanders (which was presented to the OCCA in post-conviction proceedings). From it he argues Sanders' diagnosis explains his wish for the death penalty.

Sanders diagnosed Duty with "moderate to severe" "Major Depressive Disorder, Recurrent, with psychotic features [and] Somatoform Disorder." (R. Vol. 7, Application for Post Conviction Relief, Ex. 2 at 2-3.) He opined although "Duty was NOT psychotic

---

[8] Duty alleges "the very fact he has since agreed to allow appellate counsel to develop such mitigation distinguishes him from [*Schriro v. Landrigan*] most sharply." (Appellant's Br. at 18.) This argument is unpersuasive, however, because Landrigan obviously allowed his later counsel to develop such evidence as well.

at the time of the evaluation," in Sanders' "numerous years as a Psychologist," he has "seen evidence of increasing paranoid features in inmates . . . as the length of confinement increases." (*Id.* at 2.) However, and as expressly noted by the OCCA, Dr. Sanders unequivocally stated: "Duty knows right from wrong and can choose to do right." (*Id.*)

Against this backdrop we have substantial, compelling evidence of four aggravating factors. During the hearing at which he pled guilty, Duty admitted to the State's Bill of Particulars which outlined four aggravating circumstances warranting the death penalty under Oklahoma law. Specifically, Duty admitted Wise's murder was "especially heinous, atrocious, and cruel" in the manner in which it was committed. (R. Vol. 6 at 42.) He also admitted he tied Wise up and strangled him; that it was "a death that would have involved pain and suffering" and "torture"; Wise was "conscious" and "did struggle for his life"; and Wise's death "took a while." (*Id.* at 43.) Applying Oklahoma law[9] the OCCA independently determined the murder was especially heinous,

---

[9] "Analysis [especially heinous, atrocious, and cruel factor] must focus on the acts of the defendant toward the victim and the level of tension created." *Berget v. State*, 824 P.2d 364, 373 (Okla. Crim. App. 1991). "[T]o be deemed especially heinous, atrocious, or cruel," Oklahoma law requires the victim's murder to "have been preceded by torture or serious physical abuse." *Medlock v. Ward*, 200 F.3d 1314, 1321 (10th Cir. 2000) (quotations omitted). "[T]he term 'torture' means the infliction of either great physical anguish or extreme mental cruelty" and "'serious physical abuse' or 'great physical anguish'" requires a finding "that the victim experienced conscious physical suffering prior to his/her death." *DeRosa v. State*, 89 P.3d 1124, 1156 (Okla. Crim. App. 2004). "[T]he term 'heinous' means extremely wicked or shockingly evil; the term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." *Id.*

- 19 -

atrocious and cruel. It would be folly to quarrel with that determination. Duty took great care, and perhaps perverse pleasure, in telling Wise's mother how he murdered her son and that "it was not like the movies, it took awhile." (*Id.*, Ex. 1.) While the mother's pain, callously inflicted by Duty, is not directly part of the "especially heinous, atrocious and cruel" analysis it, along with the details of the murder, is telling in other ways. Duty's own words describe a prolonged, perhaps lingering, and painful death. After being tied Wise was strangled in a calculated manner; Duty said he had been planning the murder since the day Wise moved into the cell.

As to the continuing threat aggravator (which Duty also admitted to), we again need look only to Duty's words to the prosecution:

> [Y]ou can't say I don't deserve the death penalty. I've killed another inmate, taken hostages 3 times, and assaulted a guard. Plus other various things to[o] numerous to mention . . . . Now if you don't do this you're only telling me it's ok for me to kill again [and] again because you're not gonna do anything to me. And if that's what it takes to get you to do something then I'll be more than happy to do it . . . .

(R. Vol. 1, Doc. 21, Ex. A.) Duty continued to repeat these threats to an evaluator as well as the sentencing court. That Duty murdered Wise, committed other violent crimes while in prison and had previous convictions for violent felonies is not disputed.

This case is remarkably similar to the recent Supreme Court case of *Smith v. Spisak*, — S. Ct. —, No. 08-724, 2010 WL 86341 (Jan. 12, 2010) (*Spisak*). There, Spisak was convicted by a jury of three murders and two attempted murders and sentenced to death. During closing argument at the penalty phase of trial, defense counsel described Spisak's killings in detail and portrayed him as "sick," "twisted," and "demented" and

said he was "never going to be any different." *Id.* at *7 (quotations omitted).  Spisak

argued defense counsel's closing argument during the penalty phase was "so inadequate

as to violate the Sixth Amendment." *Id.*  The Supreme Court assumed counsel's

performance was deficient but nevertheless found no prejudice because there was no

"'reasonable probability' that a better closing argument without these defects would have

made a significant difference." *Id.* at *8.  It said:

> [S]ince the sentencing phase took place immediately following the
> conclusion of the guilt phase, the jurors had fresh in their minds the
> government's evidence regarding the killings—which included photographs
> of the dead bodies, images that formed the basis of defense counsel's vivid
> descriptions of the crimes—as well as Spisak's boastful and unrepentant
> confessions and his threats to commit further acts of violence.  We
> therefore do not see how a less descriptive closing argument with fewer
> disparaging comments about Spisak could have made a significant
> difference.[10]

---

[10] During the guilt phase of the trial, in an apparent attempt to show Spisak was
not guilty by reason of insanity, defense counsel called Spisak to the stand.  *Spisak*, 2010
WL 86341, at *8.  He admitted he killed three individuals and attempted to kill two
others "because he was a follower of Adolf Hitler, who was Spisak's 'spiritual leader' in
a 'war' for 'survival' of 'the Aryan people.'"  *Id.*  "[H]e had hoped to 'create terror' at
Cleveland State University, because it was 'one of the prime targets' where the 'Jews and
the system are brainwashing the youth.'"  *Id.*  He then described each killing:

> [I]n February 1982 he had shot Rickerson, who was black, because
> Rickerson had made a sexual advance on Spisak in a university bathroom.
> He expressed satisfaction at having "eliminated that particular threat . . . to
> me and to the white race.  In June he saw a stranger, John Hardaway, on a
> train platform and shot him seven times because he had been looking for a
> black person to kill as "blood atonement" for a recent crime against two
> white women.  He added that he felt "good" after shooting Hardaway
> because he had "accomplished something," but later felt "[k]ind of bad"
> when he learned that Hardaway had survived.  In August 1982, Spisak shot
> at Coletta Dartt because . . . he heard her "making some derisive remarks
> about us," meaning the Nazi Party.  Later that August, he shot and killed
> Timothy Sheehan because he "thought he was one of those Jewish
> professors . . . that liked to hang around in the men's room and seduce and

*Id.* at \*10.

Spisak's counsel was palpably deficient.  Nevertheless, the Supreme Court easily moved to a prejudice analysis, concluding the stark facts of the murders, Spisak's delight in them and his firm purpose to commit more, all fresh in the jury's mind, would unlikely be ameliorated by a more robust defense.  Here any deficiency in trial counsel's performance is debatable (the OCCA found no deficiency and the district court did not address the issue, focusing instead, as we do, on prejudice).  But not debatable is *Strickland's* prejudice prong.  There are no differences in kind between this case and *Spisak.*  Like Spisak, (1) Duty admitted to murdering Wise, (2) the murder was a product of a coolly calculated plan, (3) the murder was cruelly perpetrated with apparent glee, (4) Duty showed (and shows) no remorse and (5) Duty plans to kill again.  Any differences

---

pervert and subvert the young people that go there."  Spisak added that he was "sorry about that" murder because he later learned Sheehan "wasn't Jewish like I thought he was."  And three days later, while on a "search and destroy mission," he shot and killed Brian Warford, a young black man who "looked like he was almost asleep" in a bus shelter, to fulfill his "duty" to "inflict the maximum amount of casualties on the enemies."

Spisak also testified that he would continue to commit similar crimes if he had the chance.  He said . . . he "didn't want to get caught [after Warford's murder] because I wanted to be able to do it again and again and again and again."  In a letter written to a friend, he called the murders of Rickerson and Warford "the finest thing I ever did in my whole life" and expressed a wish that he "had a human submachine gun right now so I could exterminate" black men "and watch them scream and twitch in agony."  And he testified that, if he still had his guns, he would escape from jail, "go out and continue the war I started," and "continue to inflict the maximum amount of damage on the enemies as I am able to do."

*Id.* at \*8-9 (citations omitted).

between Duty and Spisak are matters of degree but neither crosses the prejudice threshold. And Duty's mitigation evidence is even less compelling than Spisak's. On these facts, the OCCA's determination that Duty was not prejudiced by his counsel's failure to present the mitigating evidence he now proffers is not objectively unreasonable. In fact, we would reach the same conclusion on de novo review.[11]

C.    Oklahoma Death Penalty Protocol

Duty argues the three-chemical protocol used by Oklahoma is unconstitutional under the Supreme Court's recent plurality opinion, *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 1530-31 (2008) (subjecting individuals to a risk of future harm can qualify as cruel and unusual punishment under the Eighth Amendment but "there must be a substantial risk of serious harm, an objectively intolerable risk of harm") (quotations omitted).[12] The State argues this claim cannot be brought in a habeas proceeding[13] but must be brought as

---

[11] Duty requested an evidentiary in his habeas petition. Because he diligently sought an evidentiary hearing on this claim in state court, 28 U.S.C. § 2254(e) does not apply. *See Barkell v. Crouse*, 468 F.3d 684, 693-94 (10th Cir. 2006). Therefore, the question is whether Duty is entitled to an evidentiary hearing under the pre-AEDPA standard. *Id.* at 693. Under this standard, a habeas petitioner is entitled to an evidentiary hearing in federal court "if (1) the facts were not adequately developed in the state court, so long as that failure was not attributable to the petitioner, and (2) his allegations, if true and not contravened by the existing factual record, would entitle him to habeas relief." *Id.* at 696 (quotations omitted). He has not satisfied this standard.

[12] We have upheld Oklahoma's three-drug protocol. *See Hamilton v. Jones*, 472 F.3d 814, 816-17 (10th Cir. 2007) (denying motion for stay of execution and affirming denial of preliminary injunction); *see also Patton v. Jones*, 193 Fed. Appx. 785, 789-90 (10th Cir. 2006) (unpublished) (same). Unpublished decisions are not binding precedent. 10th Cir. R. 32.1(A). We mention *Patton* as we would any other non-precedential authority.

[13] In his § 2254 petition, Duty said:

- 23 -

a 42 U.S.C. § 1983 action.[14]  In the alternative, the State maintains the claim is

procedurally barred by Duty's failure to present it in state court.

Neither the Supreme Court nor this Circuit has definitively resolved whether

claims challenging the specific method of execution may never be considered in a habeas

proceeding.  In *Nelson v. Campbell*, Nelson brought a § 1983 action claiming the use of

> Although Mr. Duty raises his objection to lethal injection as a habeas claim in this Petition, [he] recognizes that an action under [42 U.S.C. § 1983] can be an appropriate action to challenge the method of execution.  Mr. Duty presents this habeas claim to assure that the issue will not be waived should the Tenth Circuit decide, as at least some other courts have done, that a method of execution challenge cannot be maintained as [a §] 1983 action.
>
> Mr. Duty also raises this claim now to assure that, if he later presents this issue in a [§ 1983] action, he is not foreclosed from bringing the claim for a perceived failure to timely put the State on notice of the issues involved in lethal injunction or for having engaged in an unnecessary delay in raising the claims.

(R. Vol. I, Doc. 32 at 20 (citations omitted).)  The petition was filed after *Nelson v. Campbell*, 541 U.S. 637 (2004), but before *Hill v. McDonough*, 547 U.S. 573 (2006), discussed *infra*.  We construe his petition as only alleging a habeas claim, not a § 1983 claim.

[14] The State characterizes the issue as jurisdictional, *i.e.*, that we lack jurisdiction to review Duty's protocol claim because it cannot properly be brought in a habeas proceeding but must be brought in a § 1983 action.  It is mistaken.  We have (and the district court had) habeas jurisdiction over this case.  The question is whether such claim is cognizable under § 2254.  If not cognizable, we would deny habeas relief rather than dismiss for lack of jurisdiction. *See, c.f., Cardoso v. Calbone*, 490 F.3d 1194, 1199 (10th Cir. 2007) (affirming grant of summary judgment to defendants on inmate's claim for money damages arising out of alleged due process violations during disciplinary proceedings because claim was not cognizable under § 1983); *Ellis v. Hargett*, 302 F.3d 1182, 1189 (10th Cir. 2002) (affirming denial of § 2254 petition on petitioner's claim that jury instructions misstated Oklahoma law because such state law claims are not cognizable in a federal habeas action).  Moreover, as we discuss *infra*, the Supreme Court does not consider the issue jurisdictional. *See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2319 (2009) (assuming without deciding that claim could be brought under § 1983 rather than in a habeas action).

a "cut-down" procedure to access his veins to execute him by lethal injection would violate the Eighth Amendment. 541 U.S. 637, 639 (2004). The Supreme Court determined § 1983 was an appropriate vehicle for his claim. *Id.* In *Hill v. McDonough*, the Supreme Court considered whether a challenge to a death penalty protocol "must be brought by an action for a writ of habeas corpus under the statute authorizing that writ, 28 U.S.C. § 2254, or whether it may proceed as an action for relief under 42 U.S.C. § 1983." 547 U.S. 573, 576 (2006). Because Hill's "complaint d[id] not challenge the lethal injection sentence as a general matter but [sought] instead only to enjoin the respondents from executing [him] in the manner they currently intend[ed]," the Supreme Court held Hill could proceed under § 1983. *Id.* at 580. While neither *Nelson* nor *Hill* held a § 1983 action is required in all instances, the State maintains their discussions implied such a result.

We need not resolve the issue.[15] Assuming without deciding that Duty's claim can be brought in a habeas action, he is not entitled to relief. *See Osborne*, 129 S. Ct. at 2319.[16]

---

[15] At oral argument, and after some prompting by the panel, defense counsel reluctantly admitted the protocol claim "was really stating a § 1983 claim." (Oral Argument at 15:47-:50.) We decline to foreclose consideration of the issue based upon counsel's "admission" because it came as part of the panel's colloquy with both the State and defense counsel, who were presented with myriad questions, often on matters outside the record.

[16] There, Osborne sought DNA testing in his state post-conviction proceedings, arguing he had a right to such testing under Alaska law and the Alaska and United States Constitution. The state courts denied relief. In the meantime, Osborne also filed a § 1983 action in federal court against state officials claiming he had a constitutional right to

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1). Duty concedes he did not present this claim to the state courts. Generally, we would dismiss this unexhausted claim without prejudice to allow him to return to state court. *Bland v. Sirmons*, 459 F.3d 999, 1012 (10th Cir. 2006). "However, if the court to which [Duty] must present his claims in order to meet the exhaustion requirement would now find those claims procedurally barred, there is a procedural default for the purposes of federal habeas review." *Id.* (quotations omitted); *see Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991). In this case, if Duty were to return to state court to exhaust this claim, the Oklahoma courts would undoubtedly determine the claim was procedurally barred under Okla. Stat. Ann. tit. 22, § 108. "All grounds for relief available to an applicant under [the Oklahoma Uniform Post-Conviction Procedure Act] must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised . . . may not be the basis for a subsequent application . . . ." *Bland*, 459 F.3d at 1012 (citing Okla. Stat. Ann. Tit. 22 § 108). Thus, our review is

access the State's evidence for DNA testing. The district court initially dismissed the case, concluding Osborne's claim must be brought in a habeas corpus action. The Ninth Circuit reversed, holding § 1983 was the proper vehicle for his claim. Ultimately, the Ninth Circuit determined Osborne had a due process right to access the State's evidence for DNA testing post-conviction. The Supreme Court granted certiorari to decide, *inter alia*, whether Osborne's due process claim could be pursued under § 1983 rather than in a habeas action. 129 S. Ct. at 2316. Nevertheless, because its resolution of Osborne's claims did not require it to "resolve this difficult issue," the Supreme Court assumed without deciding that the claims could be brought under § 1983. *Id.* at 2319.

- 26 -

precluded unless he "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* (quoting *Coleman*, 501 U.S. at 750). He has done neither.

We have held there is no procedural default when "the state's highest court has recently decided the precise legal issue that petitioner seeks to raise on his federal habeas petition. In such a case, resort to state judicial remedies would be futile." *Goodwin v. Oklahoma*, 923 F.2d 156, 157 (10th Cir. 1991). Duty maintains *Goodwin* applies here because challenging Oklahoma's execution protocol in the Oklahoma courts would have been futile under *Malicoat v. State*, where the OCCA specifically denied this claim on the merits. 137 P.3d 1234, 1239 (Okla. Crim. App. 2006). He is wrong. *Malicoat* was decided in 2006, two years after Duty's state petition for post-conviction relief in 2004. His argument was viable when his state petition was filed and because it was not raised, it was waived. Oklahoma's basic three-drug protocol has been in existence since 1977. The procedures have changed only in response to death penalty litigation and the amendments were intended to render the protocol more benign. Duty has given no other reason to justify his failure to properly raise his claim.

In the alternative, Duty asks us to stay the proceedings and hold his petition in abeyance so he may exhaust his state remedies.

> [S]tay and abeyance should be available only in limited circumstances. Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's

failure to exhaust his claims first in state court. Moreover, even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless.

*Rhines v. Weber*, 544 U.S. 269, 277 (2005). We find no good cause for Duty's failure to exhaust this claim and, therefore, deny his request.

**AFFIRMED.**

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge